Whitaker, Judge,
delivered the opinion of the court:
The question presented is whether the profits realized in the years 1946 to 1949 by plaintiff from the sale of lots in a 100-acre tract purchased by him in 1942 are taxable as capital gains or as ordinary income derived by plaintiff in the ordinary course of his trade or business.
Plaintiff was a County Commissioner of Hutchinson County, Texas. As such he was in charge of acquiring the right-of-way for the construction of State Highway 117, which was laid out to run through some land adjacent to the town of Borger, Texas, owned by a family known as the Weatherlys. After acquisition of the highway, plaintiff bought for his own account 100 acres of the Weatherlys land that lay on each side of the new highway, for $5,000.
Shortly after plaintiff’s purchase, the Phillips Petroleum Company considerably expanded its refining facilities located about two miles from Borger, and the Defense Plants Corporation began the erection of a synthetic rubber plant about 3 miles from Borger. This caused the influx of thousands of construction workers, creating a serious housing shortage, to such an extent that many people were living in shacks, crowded close together, with no sewers or a sanitary water supply. More and better housing facilities was a crying need. The owners of land did not need to look for a buyer. People were clamoring to buy.
When plaintiff purchased the 100-acre tract there were a number of shanties on it, erected by tenants who paid a certain ground rental. These people occupied two different areas on the tract. They desired to purchase lots on which to build more substantial houses, but they were too poor to pay cash for them. Plaintiff agreed to sell them lots in the northwest corner of the tract on the installment plan, and he platted this portion of his property into lots and streets and alleys for this purpose. This left the remainder of the property available for sale to more desirable purchasers.
*673 Much of the property was hilly and traversed by deep ravines, which necessitated considerable cutting and filling and grading, in order to make it suitable for residential purposes. Plaintiff spent $39,660.65 for levelling, grading, and filling up holes and gulleys. He spent $18,235.50 for paving streets, $7,600.92 for sidewalks, and $1,708.20 for drainage facilities. There was some expense for engineering services, attorney’s fees, and platting, making a total expenditure for putting the property in shape, so that lots could be sold, of about $80,500. This was about 16 times what plaintiff had paid for the entire tract.
Plaintiff sold 59 lots in 1945, 63 in 1946, 28 in 1947, 29 in 1948, 20 in 1949, 33 in 1950, and 21 in 1951. From sales during 1944 to 1949 he realized gross income, incurred expense, and realized net profit as follows:

Expenses and

Tear &ross Sales Cost of Lots Net Profit

1944_ $1,476. 00 $987. 65 $487.45
1945_ 22, 566.50 10,790. 95 11, 775. 55
1946_ 60, 639.20 34, 258.38 26,380. 82
1947_ 28, 850. 00 15, 087.67 13, 762.33
1948_ 36,959. 30 17,737.13 19,222.17
1949_ 29,451. 50 11, 761. 05 17, 690.45
Totals_ $179, 941. 50 $90, 622.73 $89,318. 77
During the years 1945-1949, about 65 percent of plaintiff’s income came from the sale of these lots. In no one of these years was it less than 50 percent. It follows that quite a substantial part of plaintiff’s business during these five years was the sale of these lots.
This was not a case of merely buying a piece of property, holding it until a rise in the market, and then selling it. After plaintiff’s purchase of the property, he spent time and effort in segregating undesirable tenants, in making extensive improvements on it to increase the sale price of the balance, and in handling the sales. In the five years he sold a total of 199 lots, an average of about 40 a year, and realized a total profit of about $84,000, or about 17 times his original investment.
Whether sales are in the ordinary course of business or are capital gains depends on the facts of the particular case. *674 Some of the cases dealing with this question are cited in our opinions in Garrett v. United States, 128 C. Cls. 100, and in McConkey v. United States, 131 C. Cls. 690. In both of these cases sales in the process of liquidation of estates were involved. They are not in point here, and are mentioned only for their statements of the general principle governing the determination of the question before us, and for the cases cited in them.
Taking’ into consideration the extensive improvements made on the property, the length of time required to dispose of the property, the time spent by taxpayer in preparation for and in making the sales, and the large percentage of plaintiff’s total income which was derived from the sale of these lots in the years in question, we must conclude that for these years a substantial part of taxpayer’s business was the sale of the lots and, therefore, that they were sold in the ordinary course of his trade or business, and are taxable as ordinary income.
Plaintiff’s petition is dismissed.
Laramore, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Wilson Cowen, makes findings of fact as follows:
1. Plaintiff, a resident of Borger, Texas, brought this action to recover income taxes totaling $14,140.64, and interest totaling $2,486.32, which he claims was overpaid for the years 1946 to 1949, inclusive.
2. Fritz and Helen Thompson filed separate income tax returns for the years 1946 and 1947 and joint returns for the years 1948 and 1949, in which they treated profits made on the sale of certain real estate lots as capital gains. However, after an audit of these returns, taxpayers were notified of deficiencies, since the Internal Revenue Service took the position that these profits should have been treated as ordinary income rather than as capital gains. The follow *675 ing amounts of deficiencies and interest were paid by taxpayers on the following dates:

Taxpayers also filed income tax returns for the years 1944 and 1945, in which profits made on the sales of real estate lots from the same tract of land were reported as capital gains, but these returns were never audited by the Internal Revenue Service, so that no deficiencies were paid, and these taxable years are not involved in this suit.
3. Plaintiff, individually and as sole beneficiary of the estate of Helen Thompson, filed timely claims for refund of the deficiencies alleged to have been overpaid, but these claims were disallowed by the Commissioner of Internal Revenue on February 26, 1953. This suit was timely filed.
4. From February 7, 1.937, to January 1, 1953, plaintiff was County Commissioner of Hutchinson County, Texas, for Precinct No. 2, which includes the most populous area of the county and embraces the City of Borger and the communities of Phillips, Buena Vista, Sanford, and Fritch. From 1936 to 1942, plaintiff was also engaged in the pipeline construction business. From 1942 through 1949 plaintiff owned a farm which was leased to tenants. From 1942 to 1946, plaintiff served as an officer in the Texas Defense Guard.
5. There was no space on the 1944 income tax return for listing the taxpayer’s occupation, but for subsequent years plaintiff listed his occupation in his income tax returns as follows:
1945 — various
1946 — various
1947 — various
1948 — Rentals Farming — Ranching
1949 — Rentals—Farming—County Comm.
6. About February 1942 plaintiff decided that he would offer his services to the Army and that he would sell all of *676 the assets of his pipeline construction business as soon as existing contracts were completed.
In April of 1942 he began the sale of his pipeline equipment and disposed of all of it before the close of that year. In July of 1942 he converted the warehouse, which had been used in the pipeline construction business, into seven apartments from which he derived income during the taxable years in suit. The pipeline construction business was sold and the apartments were built in order to provide a source of income for plaintiff’s family during the period he expected to be in the Army.
7. Among the many duties which were assigned to plaintiff as County Commissioner was the acquisition of the right-of-way for Highway No. 117, a proposed new highway extending through Borger. By an agreement entered into May 9, 1940, between the State Highway Commission and the county, the county was requested to acquire the necessary right-of-way. Plaintiff did most of the negotiating with the Weatherlys, who owned the land through which the proposed highway ran, and late in 1941, the right-of-way was acquired by the county at a cost of $50 per acre. The price paid by the county for this land was not generally known at the time. The contract for construction of State Highway No. 117 was let on September 23,1941, and by October 1941, the route of the new highway was a matter of common knowledge.
8. As the result of his successful and relatively easy negotiations with the Weatherlys in connection with the acquisition of the right-of-way, plaintiff approached them in January of 1942 with an offer to purchase a tract of about 100 acres of land lying on the west side of the townsite of Borger and situated on both sides of the route along which State Highway No. 117 was being constructed. At that time all of the land surrounding the city limits of Borger was owned by four large landowners, including the Weath-erlys, who owned the land to the southwest, south, and southeast of the townsite. Since the four owners were reluctant to sell any of their holdings, it was well known that it was difficult to acquire any land adjacent to the corporate limits of Borger. Plaintiff decided that if he *677 could buy the land for $50 per acre, it would be a good investment. The 100-acre tract was then occupied by approximately 100 tenants, who had erected shacks or shanties on the land and were paying annual ground rentals to the owner under year-to-year leases. Plaintiff ascertained that the total amount of the annual ground rentals amounted to about 20 percent of the amount he offered for the tract, and he had about $5,000 available for investment. His offer was accepted and after the land was surveyed, the sale was consummated on April 7, 1942, at a consideration of about $5,000.
9. The City of Borger was started by an an oil boom, but after the boom its population declined in 1930 to 6,000. In 1940 it had a population of only 10,000. However, the period from the latter part of 1942 to 1949 was one of unusual expansion for the Borger, Texas, area, because of additions to the refining facilities of the Phillips Petroleum Company, located about two miles northeast of Borger, and particularly because in August 1942, construction was begun on a site, about three miles west of Borger, of a synthetic rubber plant which was to be operated for the Defense Plants Corporation by the Phillips Petroleum Company. Although Phillips began negotiations to acquire land for the site of the rubber plant in March 1942, the project was a carefully guarded secret known only to certain representatives of the Government and a few officials of Phillips. It was not until after June 16,1942, when four sections of land had been acquired from one of the four large landowners, that plaintiff and other residents of the area learned that a Government plant was to be erected there.
Some grading and clearing were performed on the site in August of 1942, but the work shut down and nothing was done for a period of 60 or 90 days. In this interval it was rumored that the project had been abandoned. However, work was resumed and the erection of the plant proper started in 1943. Because of this and on account of substantial additions then being made to the Phillips refinery, there was an influx of thousands of construction workmen into the Borger area in the early part of 1943. As a result, there was a housing shortage in Borger, and it developed so quickly *678 that it was not foreseen by the City Manager of Borger or by residents of the town generally.
10. The Phillips Petroleum Company became interested in acquiring land for housing the large number of new employees in its refinery and the new rubber plant. Phillips intended to buy the land and then reconvey it to a builder who, in turn, would subdivide it into lots and blocks for sale to individuals. After the lots were sold, it was planned that the owners would then borrow funds for the erection of houses thereon. Periodically, from 1943 through 1947, a representative of Phillips talked with plaintiff and with the four principal landowners in an effort to purchase land which could be used to alleviate the housing shortage. Much of the land within the 100-acre tract, which plaintiff had acquired, was hilly, broken by gulleys and deep ravines, and relatively undesirable as a site for residential building. However, in 1943, Phillips asked plaintiff to quote a price on the land, and he offered to sell the entire tract at $500 per acre. The offer was not accepted, but in November 1944 Phillips again asked plaintiff to quote a price on 42 acres of the most level and desirable land in the 100-acre tract. By letter of January 24, 1945, plaintiff offered to sell the 42 acres for $1,000 per acre, but this offer was also rejected in February of 1945. Phillips decided not to purchase the land from plaintiff, because (1) Phillips decided that the total cost involved in buying and making the land suitable for housing would be excessive, and (2) the mineral interests in the land had previously been conveyed to numerous persons, and Phillips could not devise any scheme for clearing the title to the property to the extent that future owners of the lots could pledge them as security for home building loans.
11. After the period of the oil boom in Borger, many residents of the town and adjacent areas lived in shacks and other temporary houses which had been built during the boom. Many of these shacks were crowded closely together in areas where there were no sewers or a sanitary supply of water. Much of the land used for residential purposes in and adjacent to the city was not platted, nor subdivided into lots, blocks, streets, and alleys.
*679 On July 19,1942, Borger appointed a City Manager, who decided that there was an urgent need for the passage of a platting ordinance, which would require that all land used for business or residential purposes within the city and contiguous residential areas that would be annexed to the city, be platted into lots and blocks, with streets and alleys dedicated to public use in order that a sanitary water supply and public sewers could be provided for all residents of the town and such adjacent residential areas.
The City Manager’s proposal was made known to the property owners in and contiguous to the city, and early in 1943 a committee of citizens was appointed to make recommendations regarding the ordinance. The committee filed its report on February 10,1944, and at an election held on January 1, 1945, the voters approved an amendment to the city’s charter, authorizing enactment of the platting ordinance. The platting ordinance was passed and went into effect about January 22,1946, and a second election, which annexed certain adjacent land to the city, was held on February 28,1946. Plaintiff talked with the city officials about the proposed platting ordinance sometime early in 1943, and realized then that his 100-acre tract would be subject to the provisions of the ordinance.
12. On August 6, 1943, plaintiff sold 3.85 acres of land on the extreme south end of his 100-acre tract to the Borger Independent School District. At or about the same time the school district acquired from the Weatherlys a tract of about 7 acres of land adjoining the 3.85 acres obtained from plaintiff. The 10.85 acres were acquired for a new junior college established by the school district.
13. In the summer of 1944 a group of the tenants, who had been paying annual ground rental to the Weatherlys and later to plaintiff for the privilege of maintaining their shacks on the 100-acre tract, approached plaintiff and asked him to sell them the lots which they were occupying. At that time most of the shacks were located on two areas of the tract, and plaintiff stated that he would be willing to plat an area for sale to the tenants if they could find a portion of the tract where they all could locate together. He suggested an area lying in the northwest portion of the tract and also informed *680 the group that be intended to comply witb the proposed city ordinance in laying out tbe plat. Plaintiff made a rough sketch of a subdivision of lots and blocks with streets and alleys set aside for public use. As individual lots were selected, he wrote down the names of the prospective owners opposite the lot and block numbers. Later, he employed an engineer to prepare a plat in conformity with the terms of the city’s proposed platting ordinance, and this was filed for record on November 7,1944. About 90 percent of the shack owners subscribed for lots even before the plat was filed. However, many of them were poor people who were unable to pay for the lots at that time, and they entered into contracts with plaintiff to purchase the lots on an installment basis. When the lots were paid for, the deeds were executed. Thus the deeds covering the lots in Unit 1 of the Thompson Addition to the City of Borger (as the plat was designated) were executed and delivered over a period of several years as follows:
5 in 1944 62 in 1946
35 in 1945 4 in 1947
14. In the summer of 1945 a group of Borger businessmen called on plaintiff, stating that they had joined together for the purpose of obtaining some land in Borger upon which they could erect good homes and which would be protected by building restrictions. They requested plaintiff to make a portion of his tract available for that purpose, and he agreed to do so. He told them to select the area they desired and also pointed out that it would be laid out in lots and blocks and streets and alleys in conformity with the proposed platting ordinance of the City of Borger.
Late in September 1945, the plat of Unit 2 of the Thompson Addition to the City of Borger was prepared and filed. Although more than one-half of the lots were subscribed by businessmen before the plat was filed, the delivery of the deeds to the lots extended over a period of several years. Many of the subscribers did not pay for their lots or obtain deeds until they could obtain the necessary materials for constructing homes or until they were otherwise prepared to build. In Unit 2, ten lots were conveyed by plaintiff in 1945, 52 in 1946,17 in 1947,10 in 1948, and 6 in 1949.
*681 Units 3 and 4 were platted in 1947 and 1948, respectively, under about the same circumstances as Unit No. 2. As in tbe case of Units 1 and 2, most of the lots were subscribed for at or before the filing of the plats, but the actual consummation of the sales by delivery of the deeds extended over a period of several years.
Calendarwise, deeds covering the sales of the lots in the 100-acre tract were executed and delivered in almost every month from 1945 through 1949.
15. As stated in a preceding finding, a considerable portion of the 100-acre tract owned by plaintiff was situated on rough and broken terrain. In order to render the land suitable for residential sites, plaintiff spent $89,660.65 in leveling, grading, and filling up holes and gulleys. Plaintiff also put in sidewalks at a cost of $7,600.92, paved streets and alleys at a cost of $18,235.50, and installed drainage facilities at a cost of $1,708.20. In addition, plaintiff incurred expenses for attorney’s fees and for the services of an engineer so that he spent approximately $80,500 in platting the land and in making the lots suitable for residential sites.
16. As commissioner of the most populous precinct in the county, plaintiff had the reputation of being the leading commissioner. During all of the years pertinent to this action, more than 50 percent of his time was required in the discharge of his official duties. The rapid industrial growth of Borger after 1942 and the increase in its population, added new responsibilities, and there were periods when as much as 70 percent of his available time was devoted to county work.
During the years involved here, there was a great need for additional highways and for farm-to-market roads in plaintiff’s precinct. Consequently, much of his time was spent in securing the designation of new highways and assisting with problems involved in their construction. During his tenure in office, 125 miles of new highways were constructed in his precinct. He was frequently required to make trips to the State capital to meet with the State Highway Commission; he was assigned the task of obtaining rights-of-way, and he regularly attended meetings of the Texas Good Roads Association. He also traveled to Chi *682 cago, Kansas City, and other cities from time to time for the purpose of persuading various companies, who owned oil and gas pipelines in Hutchinson County, to lower their lines so that highways could be built over routes traversed by such lines.
With the growth of Borger, the county hospital proved inadequate and plaintiff participated actively in a program by which two additions to the hospital were made.
A new bridge was constructed across the Canadian River in plaintiff’s precinct in 1948, and he was assigned the job of handling the damage claims that arose in connection with the erection of the new bridge.
One of Borger’s post-war projects was a municipal airport, and among plaintiff’s activities in behalf of the airport, were a number of trips to the regional office of the Civil Aeronautics Administration in Fort Worth and at least two trips to Washington, D. C.
After the war, the people of the county became interested in having a dam built on the Canadian River in order to provide a greater supply of water, and plaintiff was elected president of a sponsoring organization called the “Canadian River Flood Control Association.” In addition to the time he spent in meetings of this organization, plaintiff also went to Washington, D. C., on several occasions in an effort to secure congressional approval of the construction of the dam.
17. Plaintiff was rejected for service in the Army in the summer of 1942 but was given a commission in the Texas Defense Guard. He served in this organization until the war ended, rising from the rank of Second Lieutenant to Major. Pie was made company commander and was also appointed Executive Officer of the 14th Battalion of the Texas Defense Guard. His duties in the latter position included work at two training camps. From 1942 until 1946, about 25 to 35 percent of his available time was spent in the performance of his duties in the Texas Defense Guard.
18. In the years pertinent to this action, plaintiff devoted about 10 percent of his time to the management of his farm and his apartments.
19. During the years 1946 to 1949, inclusive, plaintiff spent about 10 percent of his time on the Thompson Addition of *683 the City of Borger. This included the time he spent in talking with the several groups who desired to erect housing on the land, the time involved in having the plats prepared, the time spent in making the land suitable for homesites, the time required for signing deeds, and the time devoted to talking with buyers who came to see him. Plaintiff never employed any real estate broker or other person to sell any of the lots involved in this action, and he never solicited anyone to buy any part of the tract. In every instance, the purchasers came to him, either in groups or individually. Plaintiff fixed the selling price for each of the lots, and while the prices varied in accordance with the size and locations of the lots, plaintiff never reduced nor offered to reduce any of the prices fixed by him. The lots were never advertised for sale nor was a “For Sale” sign ever posted on the property.
Since the population of Borger almost doubled and the industrial expansion created a great shortage of building lots in Borger, it was not necessary for taxpayer to do extensive advertising and promoting in order to sell his lots. Taxpayer described the situation as follows:
There was a great demand for lots during the middle and late forties and I would be called at home or maybe somebody would meet me on the street or at various places and indicate that they wanted to buy a lot to get out with their friends in a place where the type of housing was better and a place that was being principally used by the business men of the City.
Plaintiff never held a realtor’s license and, although it was known that he owned some apartments, he was never considered as being in the real estate business by the local realtors, who thought of him primarily as a county commissioner. He never opened nor maintained an office for the sale of the lots.
On account of the circumstances hereinabove described, there was a demand for and a shortage of lots on which new houses or other buildings could be erected in Borger from 1943 through 1949. Insofar as city business was concerned, the activities of local realtors were largely confined to the sale of improved properties. Few vacant lots were listed for *684 sale with them. When called upon by prospective purchasers of vacant lots, the realtors referred them to a builder, who had subdivided a tract acquired for him by Phillips from one of the four principal owners of the land adjacent to Borger. In some cases, the prospective buyers were referred to plaintiff. After the plat for Unit 1 was filed by plaintiff, it was generally known by the people of Borger that plaintiff owned the land with which this suit is concerned.
20. Throughout the period that he served as County Commissioner, plaintiff maintained an office in Borger (about 13 miles distant from the county seat) where people could see him on county business, and where he also managed his personal businesses. Prior to 1942, while he was operating the pipeline construction business, he had a small office in the warehouse, which also housed the construction equipment. When the equipment was sold and the warehouse converted into apartments, he used one of the apartments as a local office for several months. Sometime during 1942 and more than a year prior to the time any of the lots involved here was sold, plaintiff moved to an office in the Miller Building in Borger, adjoining an office rented by a public accountant who did plaintiff’s auditing and tax work. The accountant’s office staff received payments from the tenants who occupied the 100-acre tract of land and issued receipts to them. The accountant’s office staff also took messages for plaintiff from various people who called during plaintiff’s absence. After the plat of Unit 1 of the Thompson Addition had been filed, the accountant’s office staff also took down the names and telephone numbers of persons who called at the office to inquire about buying lots, but neither the accountant nor any of his employees had the authority to offer the lots for sale or to sell any of them. After plaintiff received the messages left at the office, he got in touch with the individuals concerned, at times when he was not engaged on county business or in other activities.
21. The subdivision of plaintiff’s land into lots and blocks and the sale of the lots resulted from the rapid industrial expansion in Borger and from the unanticipated housing shortage which started in the early part of 1943 and continued through 1949. Although the plat of Unit 1 of the *685 Thompson Addition was filed by plaintiff about 14 months before the city platting ordinance became effective, plaintiff was fully acquainted with the purpose, effect and provisions of the proposed ordinance prior to the time that any of the lots was sold, and as a county official he decided that it was in his best interests to cooperate with the city officials by complying with the spirit and the provisions of the proposed ordinance prior to its passage.
22. The income tax returns filed by taxpayer and his wife show the following sources and amounts of gross income for the following years:

The following table, taken from the income tax returns, shows the net profit realized from sales of the lots during the . years 1946 to 1949:

Tear Net Profit

1946_$26,380. 82
1947_ 13, 762.33
1948_ 19, 222.17
1949_ 17,690.45
Total_ 77, 055.77
After all of the units were platted, there were approximately 410 lots in the Thompson Addition to the City of Borger. Between 1944 and June 30, 1952, taxpayer had sold 264 lots and the following table shows the number of lots sold each year:
1944_ 6
1945_ 59
1946- 63
1947_ 28
1948_ 29
1949_ 20
*686 1950_ 33
1951_ 21
1952 (through June)- 5
Total_264
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law plaintiff is not entitled to recover, and his petition is therefore dismissed.