Fritz THOMPSON and Dora M. Thompson, Petitioners,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

No. 20074.

United States Court of Appeals
Fifth Circuit.

Aug. 20, 1963.

Rehearing Denied Sept. 26, 1963.

Hutcheson, Circuit Judge, and Lumbard, Chief Judge, dissented in part.

Robert Edwin Davis, Wentworth T. Durant, Dallas, Tex., for petitioners.

Michael I. Smith, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Crane C. Hauser, Chief Counsel, Rollin H. Transue, Atty., I.R.S., Washington, D. C., for respondent.

Before HUTCHESON, Circuit Judge, LUMBARD, Chief Judge,[*] and BROWN, Circuit Judge.

JOHN R. BROWN, Circuit Judge.

On Taxpayer's[1] appeal from an adverse judgment of the Tax Court, two questions are presented. The first is the old, familiar, recurring, vexing and ofttimes elusive[2] problem of the treatment of proceeds of sales of subdivided lots as capital gains or ordinary income. Second, a completely novel problem never before presented and unlikely ever to arise again has to do with the treatment of a parity price support loan as income in the year received even though the loan is redeemed prior to the expiration of the tax year, and the wheat is not sold by the Taxpayer-farmer until the following year. 26 U.S.C.A. § 77.

### I.

As to the capital gains issue, the tax years involved are 1957 and 1958. The lots sold were the near tail end residue of a 100-acre tract in Borger, Texas, which Taxpayer admittedly bought as an investment in 1942 for the sum of $5,-

---

[*] Of the Second Circuit, sitting by designation.

[1] Fritz Thompson and his wife, Dora M. Thompson, are Petitioners. The activities under review are those of Fritz Thompson referred to as Taxpayer.

[2] Without perhaps giving it judicial currency, we at least took recognition, albeit in a footnote, of one realistic view of the problem. In note 3 in Cole v. Usry, 5 Cir., 1961, 294 F.2d 426, 427, we borrowed from 3B Mertens, Federal Income Taxation § 22.138, note 69, pp. 623, 624, Zimet & Weiss Rev.1958, this quotation from Comment "Capital Gains: Dealer v. Investor Problems," 35 Taxes 804, 806 (1957): "If a client asks in any but an extreme case whether, in your opinion, his sale will result in capital gain, your answer should probably be, 'I don't know, and no one else in town can tell you.'"

000.00. We are spared the necessity of discussing in any detail the background of this purchase or his extensive activities in the sale of a large number of lots up through 1949 since this is set out with factual accuracy in the Court of Claims' adverse decision covering the years 1946–1949. Thompson v. United States, 1956, 136 Ct.Cl. 671, 145 F.Supp. 534.[3]

Borger, Texas, was an oil boom town, perhaps on the wane. But it was hemmed in by four substantial landowners. Taxpayer through a judicious purchase got a 100-acre tract from one of them in 1942. Though concededly purchased as an investment, including the prospect of ground rents from a large number of squatters living in shanties, it was not long until Taxpayer commenced to sell lots. In the meantime with the ill wind of war, fortune struck Borger. In August 1942 the Government began construction of the synthetic rubber plant operated by Phillips Petroleum Company. By 1943 there was an influx of construction workers and an unexpected housing shortage. Anticipating the imminent enactment of a city ordinance requiring the filing of dedication plats for all property within the city being sold or leased for residential purposes, Taxpayer filed the first one as to Unit 1 in 1944.[4]

Thus began what Taxpayer now describes in conclusory terms as the "liquidation" of his investment. Among the early purchasers in Unit 1 were many of the so-called squatters. Within a year or so, Taxpayer was besieged by a representative group of respectable business leaders who importuned him to open up much needed residential areas for homesites suitable to their station. Taxpayer left it to this group to indicate the area preferred by them, and this resulted in the dedication of Unit 2 (see note 4, supra). Without a doubt, disposing of the lots was a simple matter for more than one-half of the lots in Unit 2 were subscribed to before the plat was filed. But parenthetically it warrants a comment that merely because business was good, indeed brisk, does not make it any less in the ordinary course of such a good business. Unit 3, platted and dedicated in 1947 (see note 4, supra) likewise resulted from circumstances similar to those surrounding Unit 2. In March 1948, the southern-most $\frac{1}{6}$ of the tract was platted as Unit 4.

These instruments of dedication (note 4, supra) also contained extensive restrictions as covenants running with the land, and showed in precise detail the areas covered by each Unit, the blocks and lots by number dedicated streets, utilities and so forth. As to Units 1, 2 and 3, Taxpayer spent a considerable sum on improvements.[5]

However characterized as capital gains versus ordinary income, the sales were

---

3. Although both Government and the Tax Court recognize that this decision, covering prior years, is not controlling by operation of collateral estoppel or res judicata, Commissioner v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898; Campbell v. Batman, 5 Cir., 1956, 239 F.2d 283; Jackson v. King, 5 Cir., 1955, 223 F.2d 714, 718, Taxpayer contends that the Tax Court was too preoccupied with this prior decision. Conceding that the facts as to such years were correctly found, Taxpayer asserts two things: first, the legal conclusions of the Court of Claims were wrong for the years 1946-1949 in the light of the standards adopted by this Court. Second, the facts as to 1957–1958 are markedly different.

4. The 100-acre tract was subdivided into four units:

| Unit | Dedication Filed of Record |
|------|----------------------------|
| 1 | November 1944 |
| 2 | October 1945 |
| 3 | March 1947 |
| 4 | March 1948 |

5. From 1942 through 1949 these were:

| Item | Cost |
|------|------|
| Leveling, grading and filling | $39,660.00 |
| Paving sidewalks | 7,600.00 |
| Paving streets and alleys | 18,235.00 |
| Drainage facilities | 1,708.00 |
| Other | 13,297.00 |
| Total | $80,500.00 |

frequent both in numbers [6] and equally so in the generation of income and net prof- its.[7] As to the two tax years in question, they were also substantial.[8] That they

6. During the years 1944 through 1958 according to his income tax returns Taxpayer had sold 376½ lots. The following table shows the number of lots sold in each of the units during each of the years involved:

| Year | Unit 1 | Unit 2 | Unit 3 | Unit 4 | Total |
|------|--------|--------|--------|--------|-------|
| 1944 | 5 | 1 | —— | —— | 6 |
| 1945 | 49 | 10 | —— | —— | 59 |
| 1946 | 63 | 54 | —— | 1 | 118 |
| 1947 | —— | 14½ | 9 | —— | 23½ |
| 1948 | —— | 9½ | 14½ | 4 | 28 |
| 1949 | —— | 6½ | 11 | 5 | 22½ |
| 1950 | —— | 2 | 27 | 3 | 32 |
| 1951 | 1 | 10½ | 9 | —— | 20½ |
| 1952 | —— | 1½ | 3½ | 4 | 9 |
| 1953 | —— | 1 | 4 | 2 | 7 |
| 1954 | —— | —— | 1 | 1 | 2 |
| 1955 | —— | —— | —— | 5 | 5 |
| 1956 | 2 | —— | 1 | 13 | 16 |
| 1957 | —— | —— | 8 | 12 | 20 |
| 1958 | —— | —— | 4 | 4 | 8 |
| Total | 120 | 110½ | 92 | 54 | 376½ |

7. Following is a schedule of gross income, expense incurred, and net profit realized from the sale by Taxpayer of lots during the period 1944 through 1958:

| Year | Gross Sales | Expenses and Cost of Lots | Net Profit |
|------|-------------|---------------------------|------------|
| 1944 | $ 1,475.00 | $ 987.55 | $ 487.45 |
| 1945 | 22,566.50 | 10,790.95 | 11,775.55 |
| 1946 | 60,639.20 | 34,258.38 | 26,380.82 |
| 1947 | 28,850.00 | 15,087.67 | 13,762.33 |
| 1948 | 36,959.30 | 17,737.13 | 19,222.17 |
| 1949 | 29,451.50 | 11,761.05 | 17,690.45 |
| 1950 | 56,045.00 | 39,345.31 | 16,699.69 |
| 1951 | 36,853.75 | 19,988.65 | 16,865.10 |
| 1952 | 20,750.00 | 11,501.82 | 9,248.18 |
| 1953 | 25,035.00 | 17,276.75 | 7,758.25 |
| 1954 | 4,000.00 | 2,226.55 | 1,773.45 |
| 1955 | 13,850.00 | 3,998.50 | 9,851.50 |
| 1956 | 34,550.00* | 12,498.51 | 22,051.49 |
| 1957 | 51,700.00* | 13,660.61 | 38,039.39 |
| 1958 | 41,975.00* | 8,343.89 | 33,631.11 |
|  | $464,700.25 | $219,463.32 | $245,236.93 |

* Note: Gross sales include amounts collected on installment sales made in prior years 1955, 1956, 1957.

8.

| Year | No. of Sales | From Unit 4 | From Unit 3 | Total Lots | Gross Sales | Net Profit |
|------|--------------|-------------|-------------|------------|-------------|------------|
| 1957 | 6 | 5 | 1 | 20 | $51,700.00 | $38,039.39 |
| 1958 | 4 | 3 | 1 | 8 | 41,975.00 | 33,631.11 |
|  | 10 |  |  | 28 | $93,675.00 | $71,670.50 |

were smaller in number but larger in dollar value was due to at least two factors. The first, and foremost, was that the land was nearly all gone. As dawn broke on 1957, only 37½ lots were left. By 1958, out of the 387 lots originally platted, 376½ had been sold. Second, Unit 4 was dedicated almost exclusively to commercial business properties. On the other hand, Unit 4 from the standpoint of topography required more extensive (and expensive) filling in and grading, all of which was done by purchasers, not Taxpayer. In contrast, Taxpayer had paid for grading of Units 1, 2 and 3, plus sidewalks. Improvements to Unit 4 were confined principally to abutting paved streets, assessments for which had been paid by Taxpayer.

While sales were brisk, it is unquestioned that there was no organized sales program. There was never any advertising. No signs were posted. No real estate agents were used or paid. Taxpayer had no other real estate which he was selling (or purchasing for resale). Prices were fixed for lots generally on a pretty uniform price per front foot. He never haggled. He stated his price. If the price was agreed to, he sold; otherwise not. These real estate activities took little of his time.[9]

The record, however, hardly bears out the insistence of the brief that Taxpayer was just a farmer. He was a man of many parts, obviously an important figure in the community with a sense of civic responsibility as the very dealings in these lots reflected. Equally obvious, he was a good businessman who had a variety of business interests. Income came from such activities as County Commissioner for a number of years, a farmer, owner of rental apartments, cattle purchases and sales, oil and gas rentals, and the like. In the fifteen-year span (1944–1958) out of gross income of nearly one million dollars, nearly 50% came from these real estate transactions, less than 15% came from farming.[10] We emphasize this not because his fortuitous 1942 purchase of this tract for $5,000 penalizes his right to claim capital gains. Rather, it is to point out that he was a man of many (and successful) businesses. One may well have been that of real estate sales whether he thought himself in it or not.

On these facts which we have severely capsulated, the Taxpayer asserts that under the standards laid down in our cases, not the least of which is Cole v. Usry, 5 Cir., 1961, 294 F.2d 426, and Barrios' Estate v. Commissioner, 5 Cir., 1959, 265 F.2d 517, the Tax Court decision is not merely clearly erroneous, but positively wrong as a matter of law. Taking these decisions and the factors set forth with much precision in Smith v. Dunn, 5 Cir., 1955, 224 F.2d 353, Taxpayer applies a color test to match element by element against the record of this case. Absence of advertising, solicitation, high pressure sales methods, or improvements such as installation of streets, plus an awesome record of sales continuity in some are emphasized. After the completion of this countdown, Taxpayer urges that, as in those decisions, we must hold these sales to be capital gains as a matter of law.

---

9. The Tax Court found that about one-half of one day of the Taxpayer's time was devoted to consummating the 1957 transactions, and about six hours of his time were used in connection with the 1958 sales (see note 8, supra). In the prior years ending in 1949 the time ran about 10%.

10.

| | |
|---|---|
| Salary | $ 62,007.63 |
| Rental property (apartments) | 65,975.44 |
| Farm (except cattle) | 128,528.82 |
| *Cattle sales | 173,816.34 |
| Ground rents | 12,129.54 |
| Oil and gas rentals | 1,996.00 |
| Oil and gas royalties, bonuses | 12,911.49 |
| Miscellaneous income | 7,352.37 |
| Fees from Phillips Pet. Co. | 8,297.60 |
| Interest | 14,598.06 |
| Real Estate (gross sales price) | 464,700.25 |
| | $952,313.54 |

* NOTE: Cattle sales confined to years 1957, 1958.

In this prolific field, it would be bootless to attempt a case-by-case distinction. It would be foreboding and unrewarding.[11] We described this process in these words. "We are aware of the decisions holding that various factors here present did not require a determination that property was held primarily for sale to customers in the ordinary course of trade or business. But each case must be decided on its own peculiar facts. * * * Specific factors, or combinations of them are not necessarily controlling." Wood v. Commissioner, 5 Cir., 1960, 276 F.2d 586, 590.

We think it fraught with less hazards for us to emphasize affirmatively the things we regard as significant. The first of these is that while technically only the tax years 1957–1958 are involved an understanding of the transactions in those years not only permits, but demands, an understanding of all that went on before. The Government overwhelmingly proved out of the mouth of Taxpayer himself that except for insignificant differences, such as sidewalks in Units 1, 2 and 3 and no sidewalks in 4, grading in the former but none in the latter, what the Taxpayer was doing in 1957–1958 was exactly the same as he had been doing for the previous 13 years. It is true that the number of sales was small in 1957 and 1958, but the reason is equally plain—either the "liquidation" program or the "sales" program was so successful that the shelves were nearly empty.

With 1957–1958 tied into 1945, into 1947, or to any of the other years, Taxpayer's own testimony was more than sufficient for the Tax Court to draw the critical inference, legal, factual or both. By his own words, he reaffirmed what his conduct had already demonstrated that he never "refused to sell" any lots, was "always willing to quote a price," was "always willing to sell if the [applicant] met" his price, and his "whole purpose of ever subdividing was to sell * * * what I could sell."

Essential as they are in the adjudication of cases, we must take guard lest we be so carried away by the proliferation of tests that we forget that the statute excludes from capital assets "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C.A. § 1221. Describing his activities in 1944 through 1958 and characterizing this mode of selling as substantially unchanged over the years, the Taxpayer left no doubt about his activities. He candidly testified that "after the subdividing of any of the property, naturally it was available for sale." Reiterating this, he went on to say that "in other words" all of these lots "were available for sale at any time after the unit was subdivided."

In contrast to many of the former decisions where changed conditions occurred which made it desirable or necessary for a person to dispose of property acquired previously for some other purpose, the circumstances here justified the Tax Court's finding that there was no objective basis for concluding that Taxpayer was engaged merely in a "liquidation" of his investment. To be sure, he was trying to make money off of it, as the law certainly permits. Equally true, the law permits an owner to reap all of the profits which a rising market, a near monopoly, or other economic circumstances bring about. The liquidation, if it really is that, may therefore be carried out with business efficiency. Smith v. Commissioner, 5 Cir., 1956, 232 F.2d 142, 145. But what was once an investment, or what may start out as a liquidation of

11. Involving capital gains treatment of long term contracts, see Commissioner v. Ferrer, 2 Cir., 1962, 304 F.2d 125, and Judge Friendly's efforts to penetrate the inscrutable as to which we are having no easy time of it. Cf. United States v. Eidson, 5 Cir., 1962, 310 F.2d 111; 1963, 312 F.2d 744; Nelson Weaver Realty Co. v. Commissioner, 5 Cir., 1962, 307 F.2d 897; Bisbee-Baldwin Corp. v. Tomlinson, 5 Cir., 1963, 320 F.2d 929.

an investment, may become something else. The Tax Court was eminently justified in concluding that this took place here. It was a regular part of the trade or business of Taxpayer to sell these lots to any and all comers who would meet his price. From 1944 on when the sales commenced, there is no evidence that he thereafter held the lots for any purpose *other than* the sale to prospective purchasers.[12] It is true that he testified in conclusory terms that he was trying to "liquidate" but on objective standards the Tax Court could equate held *solely* with "held primarily." And, of course, there can be no question at all that purchasers of these lots were "customers" and that whether we call Taxpayer a "dealer" or a "trader", a real estate man or otherwise, the continuous sales of these lots down to the point of exhaustion was a regular and ordinary (and profitable) part of his business activity.

The Tax Court's decision on this phase is therefore affirmed.

## II.

Concerning the problem under 26 U.S.C.A. § 77, the facts are uncontradicted. Taxpayer was on a cash basis. He had never used crop inventories in computing farm income. In years prior to 1958, Taxpayer had sometimes put his wheat under parity price support loans with Commodity Credit Corporation. Having reported some of these loans as income in prior years, he had elected to treat loans as income under § 77.[13] In July of 1958 Taxpayer put two identified lots of wheat under CCC loans aggregating $15,486.-

06.[14] In December of 1958, acting on advice or opinions of a probable rise in the wheat market, Taxpayer repaid the loans as to the two lots and redeemed the wheat. The wheat was on hand at the year's end. No income was reported for the disposition of these lots. This redeemed wheat was sold in January 1959 and reported as income for that year. Costs incurred in growing and harvesting it were taken as a deduction in 1958.

The Tax Court determined that the CCC loan was taxable as income in 1958 even though the loan was repaid and the wheat redeemed before the end of the taxable year. Considering the background of this legislation, we do not think that the result urged by the Government and sustained by the Tax Court is essential to achieve the end sought by § 77. Worse than that, it opens up new and vexing problems—conceptual and administrative—perhaps requiring the judicial creation of a new and counter-fiction to offset this consequence of the congressionally created fiction that a loan is income.

■ This section was not enacted as a revenue measure. It was not passed to increase the revenue. Indeed, in operative effect, its consequence is just the opposite. Rather, a very small piece to fill out a beneficent and comprehensive program of farm relief, it was enacted to overcome an unintended, but conceptually inescapable, adverse effect on the objects of congressional aid. Under farm legislation the so-called crop loans

12. In 1943–44 Phillips negotiated with him for purchase of a substantial acreage for use by it in supplying housing. These negotiations came to nothing.

13. "§ 77. Commodity Credit Loans. (a) Election to include loans in income.— Amounts received as loans from the Commodity Credit Corporation shall, at the election of the taxpayer, be considered as income and shall be included in gross income for the taxable year in which received.

"(b) Effect of election on adjustments for subsequent years.—If a taxpayer exercises the election provided for in subsection (a) for any taxable year, then the method of computing income so adopted shall be adhered to with respect to all subsequent taxable years unless with the approval of the Secretary or his delegate a change to a different method is authorized." 26 U.S.C.A. § 77.

14. Other wheat was put under loan and not redeemed. These loans were treated as income in 1958 and no question exists as to such parcels.

are an integral, vital part of the scheme of price supports.[15]

Without any effort to describe accurately the operation of this complex program, the general purpose of the crop loan is to enable the farmer to obtain as a minimum, and in cash, the support price for his crop while giving him a free ride of the market for possible market price advances until expiration of the redemption period. As conceived and practiced, it is, and is intended to be, a major source of governmental farm support payments.[16] But for these grants, the Government, as the so-called lender, must look solely to the crop as collateral security with no personal liability on the borrower.[17]

15. Current legislation reflects the congressional purpose to use crop loans as an important instrument in the maintenance of parity prices. The whole agricultural relief structure is based on parity prices to prevent the disruptive effect of crop shortages or surpluses on the flow of interstate commerce. See, e. g., 15 U.S. C.A. § 714b(i) and § 714c(a) clothing Commodity Credit Corporation with power and duty to support prices through crop loans; 7 U.S.C.A. § 1282, declaring the policy to secure orderly balance in flow of crops through " * * * loans * * * [and] assisting farmers to obtain * * * parity prices"; 7 U.S.C.A. § 1301—establishing loans, parity price, parity payments, determination of national, state, county, farm marketing quotas, and especially § 1340 as to crop loans, subparagraph (10) loans for wheat at 85% of parity, price; also § 1391 appropriations for parity loans to be made by Commodity Credit Corporation.

16. Summary of Figures Agriculture Department on Loans in Price Support of Wheat

(1,000 Bushel)

| Year | Total Production | Owned by CCC | Loans | Percent of Crop Loans and Purchases | Deliveries to CCC |
|---|---|---|---|---|---|
| 1956–1957 | 1,005,397 | 950,723 | 234,888 | 25.5 | 148,466 |
| 1957–1958 | 955,740 | 823,946 | 223,563 | 26.8 | 193,000 |
| 1958–1959 | 1,457,435 | 834,921 | 564,533 | 41.8 | 510,989 |

17. 7 U.S.C.A. § 1425 expressly provides that "No producer shall be personally liable for any deficiency arising from the sale of the collateral securing any loan made under authority of this Act [in the absence of fraudulent misrepresentation] * * *." By the Amendments August 28, 1958, Public Law 85–835, Title V, § 502, 72 Stat. 996, Congress described these as "non-recourse loans," and expressly authorized the inclusion of terms in the transaction papers by which "on and after the maturity of the loans * * * Commodity Credit Corporation shall have the right to acquire title to the unredeemed collateral without obligation to pay for any market value which such collateral may have in excess of the loan indebtedness." The purpose of this was to eliminate costly administrative distribution to farmer-borrowers of the usually trivial differences between loan and market on the date CCC takes title in lieu of its former mortgagee-pledgee interest. See 1958 U.S. Code Cong. & Adm.News, p. 4132.

The "Producer's Note and Loan Agreement" (form CL-B(1–15–58)) executed by Taxpayer in this record carried out this statutory plan. See Paragraph 10 (a) "Any holder of the producer's note shall look solely to the pledged commodity for satisfaction of such note, plus charges and interest [except for fraudulent misrepresentation]." Subparagraph (c) "Upon the maturity and nonpayment of the producer's note" CCC may pool the grain and (d) "If the pledged commodity is disposed of other than through a pool, the producer shall be paid the higher of (i) any overplus remaining from the sales proceeds * * * after deducting [the loan and charges] or (ii) the amount by which the settlement value of the pledged commodity may exceed the principal amount of the loan * * *." And under (e) if the commodity is pooled, the producer ratably participates with

But all of these beneficent ends were to come to naught at the hands of the ubiquitous collector enforcing another, though momentarily forgotten, congressional enactment. By all that was good and holy a loan simply was not income. This left the farmers in a terrible plight. For cash basis farmers, there was no income until the crop was sold, that is, either in the conventional way, or sold to CCC at the time it administratively enforced its mortgagee's security. That produced several disturbing things. Depending on the maturity dates of the loans, this could result in bunching of income in a single year. Even worse, and almost inexplorable in every instance, the farmer lost the benefit of the deduction for the costs incurred in the year of harvest for the production of the commodity put under loan. It was the purpose of Congress, so the Senate Finance Committee stated, "to avoid this harsh result" that the Code was amended. It prescribed that while these were "in form loans" they "should be treated for income-tax purposes as though such commodities had been sold in the year of the loan for the amount of the loan."[18]

The Government asserts that since the legislative history treats the receipt of the loan "as though such commodities had been sold," the taxable event is the receipt of the loan regardless of what takes place thereafter during the tax year. Besides this fragment of legislative history, it also asserts that the election requirement shows a congressional purpose to exact consistency of farmers, so that they may not play fast and loose as shifts occur in these sensitive commodity markets.

But the Government's construction is certainly not necessary to effectuate the purpose of the election. This, as is generally true in similar elective options, relates to successive tax years. Of course the Taxpayer faithfully adhered to his election. As to wheat put in loan and not redeemed in 1958, he included the loans as income in his 1958 return.

Actually, the construction now asserted would defeat the paramount aim of Congress. Farm legislation was intended to give farmers a free ride of the market. However, the inescapable income tax rulings prevented that when the loan and the redemption (or foreclosure) overlapped two tax years. This was the problem, and the only problem. There was no problem as to a loan received and repaid within the same year. If the Government's view is accepted, it means that as to an area in which there was no problem, Congress has unwittingly withdrawn from that farmer the right to ride the market to the year's end. Thus an amendment to the Revenue Code designed to "avoid this harsh result" (see note 18, supra) becomes itself a new instrument to frustrate the predominate goal of agricultural relief.

Moreover, to follow the Government's thesis, judicial tinkering is required to avoid yet a further and more awesome hardship. Here the wheat redeemed in 1958 was sold within a few weeks because of market conditions in 1959. The price was just slightly better than the amount of the former loan. The Taxpayer returned this as income in 1959. Being the sale of a commodity, it surely was income. How is it to be treated? The Government's reply is an easy one. Applying literally the "as if" aspect of § 77 the loan in 1958 was a vicarious "sale." When the loan was redeemed there was another "as if" transaction with the tables now reversed—the farmer now being the buyer, the CCC the seller. This gave the Taxpayer a new cost basis equivalent to what he "paid" for wheat he never really did sell and which belonged to him all the time.

other producers whose commodity has been pooled.

18. See S.Rep. No. 648, 76 Cong., 1st Sess., p. 8, 1939-2 Cum.Bull. 524, 529, which accompanied the Revenue Act of 1939, c. 247, 53 Stat. 862, § 223(a), adding § 123 (the predecessor of 1954 Code § 77) to the Internal Revenue Code of 1939 (26 U.S.C. § 123 (1952)). See also 1 Seidman, Legislative History of Federal Income & Excess Profits Tax Laws, pp. 1923-26 (1954).

To this the Taxpayer responds that this puts a cash basis farmer on an inventory basis without the consent to change which the Regulations require. See Treasury Regulation § 1.471–6. The Government counters that Treasury Regulation § 1.61–4(a) allows cash basis farmers to have a cost basis in "livestock or other items which were purchased." Without undertaking here to resolve this dispute, it is clear to us that Congress never intended to inject into this relief measure—to relieve a relief statute from unintended consequences—the uncertainties arising from carrying the "as if" provisions so far. It did not mean to leave relief to the yet unexplored right to treat the second transaction not specified in § 77—the redemption of the loan—as a sale giving rise to a cost basis. Nor did it anticipate that it was exposing farmer taxpayers to further mysteries of a vicarious election as to cash or accrual basis accounting or vice versa.[19]

■ The facts in simple outline convince us that Taxpayer is right. At year end 1958 Taxpayer had the wheat. He did not have money. In 1959 he had money, but no wheat. § 77 does not prescribe that the loan *is* income. It prescribes that it should be "considered as income" and when so done, the "method of computing income so adopted shall be adhered to * * *." This terminology and the interpretation we put on it achieves several ends. It adheres to the annual accounting concept of income tax law. It makes possible the payment of the tax in the year in which the income is realized with which to pay the tax. It eliminates either the peril or problems of the taxpayers being taxed in successive years on the same wheat crop, and it eliminates vexing problems on collateral elections.

We therefore reverse the Tax Court decision as to this aspect.

Affirmed as to part I.

Reversed as to part II.

HUTCHESON, Circuit Judge (concurring in part and dissenting in part).

I respectfully, but nonetheless emphatically, dissent from the majority's affirmance of that part of the decision of the Tax Court relating to the capital gains issue. (PART I)

The majority's decision is so patently at variance with the plain meaning and intent of the statute and the established law of this court that a lengthy elaboration of my views will be unnecessary. As pertinent to this case, the statute denies capital gains treatment to profit resulting from the sale of "property held by the taxpayer primarily for sale to customers *in the ordinary course of his trade or business.*" 26 U.S.C.A. § 1221. (Emphasis added) Were this the first case applying that provision, it would be manifest on even the most cursory examination that the appellants' sales were *not* of property held *primarily* for sale in the *ordinary course of trade or business.*

But this court has frequently had occasion to consider that statutory provision, and, in so doing, it has articulated and developed a consistent and reasonable body of law to govern its application. Under those established principles, it is evident that the majority here reaches an incorrect result. E. g., Cole v. Usry, 5th Cir., 1961, 294 F.2d 426; Barrios' Estate v. Commissioner, 5th Cir., 1959, 265 F.2d 517; Thomas v. Commissioner, 5th Cir., 1958, 254 F.2d 233; Smith v. Dunn, 5th Cir., 1955, 224 F.2d 353; Goldberg v. Commissioner, 5th Cir., 1955, 223 F.2d 709. Indeed, the facts in both Cole and Barrios' Estate—in both of which, the taxpayer prevailed—are so similar to those of the present case as to compel reversal of the Tax Court.

These and similar cases are dismissed by the majority with the cavalier statement that: "In this prolific field, it would be bootless to attempt a case-by-case distinction. It would be foreboding and unrewarding." It would of course, be

---

19. What action triggers the change? Can the Commissioner treat it as an implied change? Cf. Patchen v. Commissioner,

5 Cir., 1958, 258 F.2d 544; Gill v. United States, 5 Cir., 1958, 258 F.2d 553.

"foreboding and unrewarding" for the majority to attempt to distinguish those cases, because it *cannot* distinguish them. It would be self-defeating for the majority even to *discuss* those cases, because to do so would lay bare the fact that the majority is ignoring the law as laid down by this court. The majority does not expressly overrule this court's prior decisions, but it refuses to follow them.

The majority, in its opinion, tacitly admits that it is not following the law as established in this circuit. The majority gives no reason for not doing so. Absent a compelling reason to change the law, I think that parties have a right to rely on, and the court has a duty to follow, the law as already developed. This case stands alone in this Circuit in its result. I trust that it will continue to do so.

Because the Tax Court's findings resulted from an erroneous view of the law, those findings are clearly erroneous, and I would reverse its decision relating to the capital gains issue.

LUMBARD, Chief Judge (concurring and dissenting).

Although I concur in all that Judge Brown says in Part I of his opinion, I dissent as to Part II. As the taxpayer made his election under § 77 to treat the loans as income at the time of receiving the proceeds of the loans there is no reason why he should not abide the consequences of that decision. If it is proper for Congress to create such a fiction in order to assist the taxpayer there is no reason why the courts should relieve him of the consequences for one year when it appears to him that it would be more advantageous not to treat the loans as income. Here an anticipated rise in the price of wheat made it advantageous to repay the loan on some of the wheat and regain possession of the wheat which was later sold at a profit the next month which fell in a different taxable year. It is just as if a taxpayer sells his property, then buys it back and sells it again. The taxpayer established a new tax basis by repaying the loan and upon the later resale his profit is ascer-

tained by deducting the cost basis from the resale price at the later time. Nor would this procedure be inconsistent with the taxpayer's operation on a cash basis.

I would affirm the decision of the Tax Court that the taxpayer realized income in 1958 to the full extent of his loan receipts from the Commodity Credit Corporation.