**BIEDENHARN REALTY COMPANY, INC., Plaintiff-Appellee,**

**v.**

**UNITED STATES of America, Defendant-Appellant.**

**No. 73–3690.**

United States Court of Appeals, Fifth Circuit.

March 10, 1975.

Rehearing En Banc Granted May 12, 1975.

**172**

Scott P. Crampton, Asst. Atty. Gen., William A. Friedlander, Atty., Tax Div., Dept. of Justice, Washington, D. C., Donald E. Walter, U. S. Atty., Shreveport, La., Fleming T. de Graffenried, Tax Div., Dept. of Justice, Dallas, Tex., William A. Whitledge, Atty., Meyer Rothwacks, Chief, Appellate Sec., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Paul K. Kirkpatrick, Jr., John C. Blackman, Nauman S. Scott, III, Monroe, La., for plaintiff-appellee.

Before GEWIN, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Once more we are called on to characterize profit from sales of subdivision lots as ordinary income or capital gain.

The facts, pre-eminent in these cases,[1] are detailed in the careful opinion below[2] and we set out only a précis of them.

Taxpayer is a family investment corporation organized by the paterfamilias in 1923 for advantages of scale and unity. Among its holdings are bottling plants, a shopping center, miscellaneous commercial and residential rent properties, several going businesses, a portfolio of stocks and bonds, two farms, and Hardtimes Plantation. This last, the terrain of our case, is a 973-acre farm purchased at a bargain[3] in 1935. Taxpayer has since farmed it continuously but has also, as the nearby city of Monroe expanded toward and over Hardtimes during the years from 1939 through the taxable years in question (1964–66), subdivided and disposed of about half its acreage in residential lots. Since the United States does not dispute that taxpayer's original purpose in buying Hardtimes was investment, but rather contends that a change in that purpose is evidenced by taxpayer's mode of operation and handling of the property, we describe these briefly.

Taxpayer has four employees: A farmer and a camp caretaker are full-time, but its manager and its bookkeeper are, respectively, principally employed as general manager and comptroller of a soft drink corporation, another family enterprise. The manager testified that taxpayer's affairs occupied about ten percent of his time, chiefly spent in supervising rental collections and building maintenance. Taxpayer has a listed telephone, which rings in the soft-drink concern's offices, but no offices of its own. Though, because of special circumstances,[4] the taxpayer has platted and sold one other tract in lots and platted, though it did not so sell, two others back in the 1920's, it is fair to say it does not have a significant history of acquiring and subdividing other tracts of land. Indeed, the United States does not seriously contend that it is in that business unless its Hardtimes activities put it there.

1. United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969).

2. Biedenharn Realty Co. v. United States, 356 F.Supp. 1331 (W.D.La.1973).

3. For $50,000, or just over fifty dollars per acre. Record evidence indicated a raw land value of one of the subdivisions when sold at seven to eight thousand dollars per acre.

4. Taxpayer purchased a site for a glass plant, but negotiations with the glass company failed to persuade it to locate in Monroe. Taxpayer therefore platted and sold the site.

The subdivision and sale of Hardtimes has proceeded somewhat languidly. From the time of the first lot sale in 1939 through 1966, the last taxable year in question, sales averaged about five per year. Some sales were of multiple lots. 1957 was the high year, with 23 transactions involving 35½ lots. In six of these years, no lots were sold and in eight—including 1962 and 1963—only one. During the three taxable years in question sales were 37, or about one per month on the average.

In all instances taxpayer laid out and paved streets by the lots sold, and sometimes it added curbs and gutters, sewerage and utilities. Selling was by independent commission agents, who handled all aspects of the transaction except fixing of price and transfer of title, done by the taxpayer. The agents bore, from their commissions, such merchandising costs as there were: signs posted on the property and newspaper advertisements. Taxpayer's profits ranged from 74% to 97%, reflecting in significant part[5] the initial bargain price and the approach of Monroe. During the years in suit, gains from Hardtimes' lots were about 11% of taxpayer's gross income.

Our case originated as taxpayer's action for refund of something over $30,-000 in additional taxes determined by the Internal Revenue Service to be due as a result of its classification of the 1964–66 gain on lot sales as ordinary income. The district court, taking testimony and documentary evidence which established as undisputed the facts summarized above, concluded that the lots in question were not "held primarily for sale" nor were the taxpayer's activities in connection with them a "trade or business." Instead, it found the taxpayer to have been engaged in no more than the reasonable improvement for liquidation and liquidation of portions of a large farm property acquired and held for investment, which had greatly appreciated in value as a result of market factors favorable to but not caused by the taxpayer. The Court's analysis proceeded along conventional lines, giving due regard to the seven major factors reiterated in *Winthrop*[6] and recognizing that these furnish only a matrix giving form to the consideration of each individual case as a whole. Other appropriate principles are recognized and applied in the published opinion, a reiteration of which would serve little purpose here. On appeal to us, however, the Government attacks along lines somewhat less conventional, which may be fairly summarized as follows:

Capital gain treatment, we are told, must turn on the purpose for which the property is held *at the time of sale,* not at some earlier time. Biedenharn Realty Company, the taxpayer, was subdividing, improving and developing this land, a procedure generally recognized as a business. Had Biedenharn bought this land for purposes of subdividing just before so using it, it could not have expected capital gain treatment. *Hence,* its earlier purposes and uses become irrelevant. Moreover, Biedenharn's activities may not properly be considered liquidation, since in a "true" liquidation the property is offered without change of form, for whatever price it will bring. Since Bied-

5. The court below heard expert testimony that subdividers' profits in the area usually did not exceed 33⅓%.

6. "(1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. Smith v. Dunn, supra [5 Cir.], 224 F.2d [353] at 356.

Despite their frequent use, this court has often declared that these seven pillars of capital gains treatment 'in and of themselves * * have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety to determine whether or not the property involved was held primarily for sale in the ordinary course of business (source cited).' Cole v. Usry, supra [5 Cir.], 294 F.2d [426] at 427. Accord: Thompson v. Commissioner of Internal Revenue, 5 Cir. 1963, 322 F.2d 122; Wood v. Commissioner of Internal Revenue, 5 Cir. 1960, 276 F.2d 586; Thomas v. Commissioner of Internal Revenue, 5 Cir. 1958, 254 F.2d 233; Smith v. Commissioner of Internal Revenue, 5 Cir. 1956, 232 F.2d 142; Consolidated Naval Stores Co. v. Fahs, 5 Cir. 1955, 227 F.2d 923." United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969).

enharn sought to create additional value by changing the property's form, it chose not to "liquidate" but to use the property in a new and different manner—and one recognized as a business. Biedenharn's situation should be tested purely by examining the nature of its activities at time of sale, or as if its original purpose in buying the land was subdivision and sale of residential lots. So seen, Biedenharn's situation is not essentially different from that of Winthrop and Thompson.[7] Finally, at oral argument stress was laid on the incongruousness, even unfairness, of according markedly different tax treatment to two hypothetical parcels of land, lying side by side and developed and sold in the same or similar manners, on the basis, in part, of past purposes and uses, or even present uses of other adjacent portions in common ownership.[8]

■ We are not persuaded. The first argument, which asks us in terms to read out of the analysis Winthrop's first factor—"the nature and purpose of the acquisition of the property and the duration of the ownership"—would require us to overrule Winthrop pro tanto, which we decline to do. Implicit in the capital asset concept are such notions as the factor epitomizes; they belong in the calculus. Further, the argument proves too much: if one focuses exclusively on the instant of sale, of course the lot being sold is at that moment "held primarily for sale." And if a recent, constructive purchase for purposes of subdividing is to be imputed in every case of a lot sale, then the concepts of purchase for investment and orderly liquidation, embedded in our case law,[9] are simply purged from it.

■ The second argument, asserting that any change in form of the asset made by the taxpayer prevents its disposition being a liquidation, flies directly in the face of this Court's holding in Barrios' Estate v. Commissioner of Internal Revenue, 265 F.2d 517, 520 (5th Cir. 1959), cited and quoted with approval in Winthrop:

> · The idea of selling a large tract of land in lots embraces necessarily the construction of streets for access to them, the provision of drainage and the furnishing of access to such a necessity as water. It is hardly conceivable that taxpayer could have sold a lot without doing these things.[10]

On reason and authority, we reject it.

■ The final argument, instancing possible differing tax consequences for adjacent tracts developed similarly merely because one was acquired as an investment and long held while the other was not, represents a mild form of the "chamber of horrors" or "most unforeseeable consequences" technique—and likewise proves too much. Such possibilities are inherent in the congressional scheme of providing different tax rates for gain realized on disposition of long-held capital assets than for ordinary income. There is nothing especially shocking in this instance of the general plan; a mere day or two's difference in the holding period of a capital asset could

---

7. Thompson v. Commissioner of Internal Revenue, 322 F.2d 122 (5th Cir. 1963).

8. In counterpoint, the Government also pursues a reliance on Winthrop, supra, and a likening of this case to that, in which the Service prevailed. But there are significant facts distinguishing Winthrop from the matter in hand, some noted in the district court opinion and some not. Winthrop inherited substantial acreage in the Tallahassee environs and pursued an orderly program of subdividing and selling it, platting and laying out streets, installing utilities and in some cases sewer lines. Unlike Biedenharn, however, this was his primary and, indeed, well-nigh his sole activity during the tax years in question. Over half his income resulted from this activity. The tempo of his sales was somewhat higher, having reached 64 transactions in one past year and averaging 24 per year over the period of his efforts. On some of the lots he constructed houses for sale. He held a real estate brokers license and, though rather passively, did his own selling. His sole motivation, our opinion notes, long before the tax years mooted, had been the development and sale of his lots, and he devoted to it a substantial amount of his time, skill and financial resources. He began selling lots shortly after he acquired the land and he never used the land for any other purpose. None of these factors, taken alone, is a talisman. Taken together, however, as they must be, they make ours a different case; and by its other arguments the Government tacitly but correctly recognizes that it must go beyond Winthrop to prevail here.

9. See authorities at note 6 above.

10. United States v. Winthrop, 417 F.2d, at 909.

have a similar effect. As the Government notes, it is just conceivable that two hypothetical tracts might be side-by-side and be so developed that *Winthrop's* other six factors are equivocal and so that a difference in purpose of purchase and holding period between them might be dispositive of capital gain treatment for one and ordinary income treatment for the other. If so, we need not blanche; if this factor is to be included in the seven other than as a sham there must be instances imaginable in which it will be critical, perhaps dispositive. On this head, the Government's argument finally comes down to a dispute with the Congressional scheme of taxation and with *Winthrop*. We are powerless to alter the first were we so inclined, and we decline to alter the second.

Thus matters remain, in our Circuit, essentially where the now-famous [11] passage from an earlier edition of Mertens, commenting on "Capital Gains: Dealer v. Investor Problems," left them: "If a client asks in any but an extreme case whether, in your opinion, his sale will result in capital gain, your answer should probably be, 'I don't know, and no one else in town can tell you.'" The difficulty, however, is inherent in the nature of the thing itself, and does not lie in judicial perversity or a delight in being obscure. Results cannot be casually predictable where so many variables are present and so many factors of judgment must be exerted. Extreme cases will be clear, but those who elect to sail close to the wind must take their chances.

■ Biedenharn has walked a dangerous path in the case at bar. The trial court concludes that it has done so unscathed. And though, as *Winthrop* notes, where there is no basic disagreement as to the evidentiary facts and the trial court's conclusion of the ultimate facts is the product of legal reasoning, we are not trammeled by the clearly erroneous rule, still the decision of the court which saw and heard the witnesses is always entitled to a certain deference. We conclude, moreover, that the court correctly applied our case law and that its decision is right.

Affirmed.

GEWIN, Circuit Judge (dissenting):

With deference to the views expressed in the majority opinion, I respectfully dissent. The relevant facts are sufficiently outlined by Judge Gee. It is my view that the facts, when considered in their totality, United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969), compel the conclusion that the lots in question were "held primarily for sale" and that the taxpayer's activities in connection with the lots was a "trade or business." Accordingly, the profits from the land sales should be regarded as ordinary income, rather than capital gain.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

Before BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, RONEY and GEE, Circuit Judges.

BY THE COURT:

A member of the Court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc.

It is ordered that the cause shall be reheard by the Court en banc on briefs without oral argument. The Clerk shall set a briefing schedule for the filing of supplemental briefs.

11. Quoted in Cole v. Usry, 294 F.2d 426, 427 n. 3 (5th Cir. 1961) and Thompson v. Commissioner of Internal Revenue, 322 F.2d 122, 123 n. 2 (5th Cir. 1963).