**W.J. ASMUSSEN and Alice Asmussen, Plaintiffs,**

**v.**

**UNITED STATES of America, Defendant.**

**Civ. No. 82–3015.**

United States District Court, D. South Dakota, C.D.

Nov. 2, 1984.

This, however, shows only that the students had dual responsibilities to both the school systems and William and Mary.

Joe H. Neumayr, Gettysburg, S.D., David L. Knudson, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for plaintiffs.

Philip N. Hogen, U.S. Atty., Sioux Falls, S.D., Lawrence E. Meuwissen, Trial Atty., Tax Div., Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

DONALD J. PORTER, District Judge.

W.J. and Alice Asmussen, plaintiff taxpayers, seek to recover $43,368.65 plus interest paid as federal income tax for calendar year 1976. The central issue in this action is whether a gain recognized by the taxpayers on the sale of rye in 1976 is long-term capital gain or ordinary income. The rye was originally produced by taxpayers on their South Dakota grain farm, then pledged to the Commodity Credit Corporation (CCC) as security for a loan, and later redeemed. Although Section 1221 of the IRC would generally preclude capital gains treatment of a gain made by a farmer on the sale of his crops, the taxpayers' participation in the CCC program combined with facts indicating an investment intent with regard to the redeemed rye leads this court to conclude that the gain was a long-term capital gain. Accordingly, defendant is ordered to fully refund to plaintiffs the disputed taxes, with interest.

## FACTS

The facts of this case have been stipulated by the parties. Plaintiffs, cash basis taxpayers, are grain farmers in central South Dakota. They raise a number of crops: primarily wheat, but also in certain years; rye, flax and oats. In 1972, plaintiffs pledged 96,635 bushels of rye from their 1971 rye crop with the CCC as security for a parity price support loan. The loan rate per bushel for the pledged rye was 83 cents. Pursuant to Section 77 [1] of the IRC, plaintiffs elected to treat the loan proceeds, which amounted to $80,198.63, as ordinary income on their 1972 joint income tax return.

While the rye was pledged as security for the CCC loan, it was stored in twenty-three separate storage bins identifiable from plaintiffs' other existing inventory of approximately 110,000 bushels of rye never pledged to the CCC. In 1973, CCC required that the price support loans be either redeemed or forfeited. The per bushel redemption rate for the rye at that time, including interest, was 86.3 cents. At the same time, the price per bushel at a local grain elevator was 88 cents. After redemption, the redeemed rye remained in the same twenty-three storage bins until it was sold in a single transaction in 1976.[2] The rye sold for over $2 a bushel and plaintiffs recognized a gain of $135,554.54 which they reported as a long-term capital gain on their joint return for 1976. For this gain, plaintiffs reported a deduction of

---

1. 26 U.S.C. § 77 provides:

   **(a) Election to include loans in income.** Amounts received as loans from the Commodity Credit Corporation shall, at the election of the taxpayer, be considered as income and shall be included in gross income for the taxable year in which received.

   **(b) Effect of election on adjustments for subsequent years.** If a taxpayer exercises the election provided for in subsection (a) for any taxable year, then the method of computing income so adopted shall be adhered to with respect to all subsequent taxable years unless with the approval of the Secretary a change to a different method is authorized.

2. For purposes of this case, the parties stipulated that the redeemed rye was sold in a single transaction in 1976. Actually, of the 96,635 bushels of rye pledged and redeemed, 76,635 bushels were sold in the 1976 sale. At a hearing held October 3, 1984, it was disclosed that taxpayers sold the other 20,000 bushels in previous years and took capital gains deductions. The Government objected to these deductions also, but eventually compromised with the taxpayers.

$67,777.27 pursuant to Section 1202 of the IRC.

Following an audit of plaintiffs' 1976 return, in a letter dated January 2, 1980, the IRS notified plaintiffs that it did not consider the redeemed rye to be a capital asset, and therefore disallowed their long-term capital gain deduction. This resulted in a deficiency of $43,368.63. In response to the IRS audit, plaintiffs filed a protest letter on January 29, 1980 objecting to the disallowance of their long-term capital gain deduction. Plaintiffs paid the assessed deficiency on July 9, 1980 under protest, and on October 2, 1980, plaintiffs paid accrued interest on the deficiency in the amount of $9,895.48, also under protest. On November 10, 1980, plaintiffs filed a claim for refund of the taxes and interest. It is this claim for refund that is now before this court.

## DECISION

Essentially, this is a case in which a farmer seeks capital gain treatment on the sale of a crop raised on his farm. Section 1221 of the IRC would appear to run contrary to such a proposition. It excludes from the definition of capital asset

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.

Thus, it seems fundamental that a farmer would receive ordinary income when he sells his crop even if he stored it for a period before selling it in order to speculate on the market price. Further, a farmer would presumably receive ordinary income if he first pledged the crop to the CCC, later redeemed, and then sold the crop. The taxpayers contend, however, that their participation in the CCC program, coupled with facts clearly showing an investment

intent, qualifies the rye in this case as a capital asset entitling them to the deduction.

### I.

Because the rye was raised on the plaintiffs' farm, without the CCC redemption, there could be no capital gains treatment. The rye would be property held by the plaintiffs "primarily for sale to customers in the ordinary course of [their] trade or business", and plaintiffs would not be entitled to a refund despite the presence of other facts indicative of investment intent. Moreover, for plaintiffs to prevail, the redemption must be viewed as a "repurchase" of the rye following "sale" to the CCC rather than a loan transaction as the Government now seeks to characterize it. The proper characterization of the CCC program, then, is a threshold issue in this case.

Plaintiffs' characterization of the redemption as a repurchase of the crops from the CCC is consistent with Section 77(a) of the IRC. This section provides that "[a]mounts received as loans from the Commodity Credit Corporation shall, at the election of the taxpayer, be considered as income and shall be included in gross income for the taxable year in which received."[3] Thus, it is at least clear from the statute itself that a taxpayer can choose to treat the initial pledge of crops to the CCC as a sale for tax purposes. *See United States v. Isaak*, 400 F.2d 869 (9th Cir.1968). According to plaintiffs, it follows that where there is a sale, a subsequent redemption should be treated as a repurchase. The parties cite, and the court's research reveals, only two published opinions relevant to this issue.

In *Thompson v. Commissioner of Internal Revenue*, 322 F.2d 122 (5th Cir.1963), the Fifth Circuit was confronted with the issue of whether a farmer who had made a binding Section 77 election had to include in his taxable income a CCC price support

---

**3.** There is no dispute in this case that the taxpayers properly elected to report such transactions under Section 77 or that they had previously reported amounts received from the CCC in return for crop pledges under this section.

loan made for wheat which was pledged and redeemed in the same tax year. Ironically, the Government's position in the *Thompson* case was the same as the taxpayers' in this case. The *Thompson* court summarized that position as follows:

> Applying literally the "as if" aspect of § 77 the loan in 1958 was a vicarious "sale." When the loan was redeemed there was another "as if" transaction with the tables now reversed—the farmer now being the buyer, the CCC the seller.

*Id.* at 130. The Government contended that the taxable event was the loan regardless of what took place thereafter, including complete or partial redemption of the pledged crop within the tax year.[4] In rejecting the Government's argument, the *Thompson* court focused first on the general purpose of the CCC program. The court stated that the program's paramount aim was "to enable the farmer to obtain as a minimum, and in cash, the support price for his crop while giving him a free ride of the market for possible market advances until expiration of the redemption period." *Id.* at 129. The court then examined the legislative history underlying Section 77. The legislative history revealed that until Section 77, a cash basis farmer could only have income when the pledged crop was sold.[5] Depending on the maturity dates of the loans, this produced a bunching of income in a single year. It also meant the farmer could lose the deduction for costs incurred in the year of harvest for production of the pledged commodity. Congress cured these problems by enacting Section 77. In sum, Section 77 was designed to remedy the problems associated with loan and redemption or sale occurring in overlapping tax years. It was not enacted, according to the *Thompson* court, to have any application to a crop pledged and re-

deemed within a single tax year. The Government's argument, continued the court, was hostile to the "free ride to market" concept of the CCC in that it would mean "Congress has unwittingly withdrawn from that farmer the right to ride the market to the year's end." *Id.* at 130. In other words, the CCC's purpose of providing the CCC program farmer with a choice—forfeit the pledged crops if the market price goes down or remains stable, redeem if the market price goes up—is rendered meaningless by adverse tax consequences.

A second problem with the Government's argument perceived by the *Thompson* court was that it did not adhere to the annual accounting concept of income tax law. The farmer taxpayer pledged wheat to the CCC in July, 1958. In December, 1958 he redeemed the wheat. The redeemed wheat was sold in January, 1959 and reported as income for that year. The *Thompson* court decided that as between 1958 and 1959, the preferable year to report the income was 1959, the year in which the income was realized and the taxpayer had the wherewithal to pay.

The IRS never acquiesced in the *Thompson* decision, and made the same argument five years later when the Ninth Circuit decided *United States v. Isaak*, 400 F.2d 869 (9th Cir.1968). Confronted with essentially the same facts and issue disposed of in *Thompson*, the *Isaak* court adopted the repurchase approach. In deciding the case, the court found helpful Section 1016(a)(8) of the IRC relating to change of basis for property pledged to the CCC "to the extent of any deficiency on such loan with respect to which the taxpayer has been relieved from liability." The court stated that Section 1016(a)(8) extended Section 77's sale analogy "to redemption which is treated a *repurchase* with the redeemed crop taking

---

4. This argument was accepted by the Tax Court which flatly stated, "[w]here the receipt of a Commodity Credit Corporation loan is considered as a sale of wheat, certainly a payment in redemption of the wheat should be considered as a repurchase of that wheat." *Fritz Thompson*, 38 T.C. 153, 168 (1962).

5. Either conventionally, or sold to the CCC at the time it exercised its option to require the farmer to redeem or forfeit the pledged crop.

as its basis the amount of loan received." (Emphasis added). *Id.* at 870.

At first glance, it would appear that for this court to adopt plaintiffs' *Isaak*-type characterization would necessarily constitute a rejection of *Thompson.* Upon closer scrutiny, however, this is clearly not true. The facts of both *Thompson* and *Isaak* are distinguishable from this case, and consequently, *Thompson*'s rationale for rejecting the repurchase-redemption analogy is inapplicable to the facts of this case. *Thompson* and *Isaak* are cases in which a farmer who had previously made the Section 77 election to treat a CCC loan as income in the year the loan was received sought to avoid inclusion of a loan as income on the ground that the pledged crop had been redeemed within the tax year. Stated differently, the taxpayers were urging that the redemption canceled the need for reporting the loan proceeds as income in the year of the loan's receipt. In this case, there is no controversy as to whether the loan should have been included in the taxable year of its receipt. The parties have stipulated that plaintiffs reported their CCC loan proceeds on their 1972 income tax return as ordinary income, and that plaintiffs did not redeem the rye until the next tax year. Thus, the *Thompson* court's rationale to the effect that the "repurchase" analogy interferes with the free ride to market policy behind the CCC program is inapposite. Second, to hold that plaintiffs in this case effectively repurchased the rye in no way contravenes the annual accounting concept of income tax law. The plaintiffs paid ordinary income tax on the loan proceeds pursuant to Section 77 election in the year of receipt. They did not redeem that year. They redeemed in a subsequent tax year, and in 1976, when they finally sold the rye, they paid taxes on the gains made from that sale. This court reads *Thompson* and *Isaak* as directly conflicting, but it does not read *Thompson* as conflicting with the decision in this case. *Thompson* seems to reject the redemption-repurchase analogy in the particular case of a loan made and redeemed in the same year.

Under this analysis, *Isaak* would, of course, not be direct precedent for holding that the rye in this case was "repurchased" either. Like *Thompson,* it dealt with a loan and redemption occurring within the same tax year. This court is, however, persuaded by the consistency offered by the *Isaak* redemption-repurchase analysis. As the *Isaak* court noted, Section 1016(a) providing for an adjustment to basis for redemptions would seem to imply extending the sale analogy to the redemption. *See Isaak, supra* at 870. This court views the sale-repurchase theory advanced by the Government in *Thompson* and *Isaak* and by the taxpayers in this case as the more reasonable under the circumstances in this action. However, this in no way is intended to mean that mere redemption of crops pledged to the CCC necessitates their becoming capital assets. That issue is not before the court. The issue here is whether, under all the circumstances objectively indicative of taxpayers' intent, taxpayers had a subjective intent to treat the rye as an investment. This court believes that they did have such intent.

## II.

A commodity producer, including a farmer, is not automatically barred from holding as a capital asset a commodity he produced. Case law is replete with instances where a court permitted producers to take an investment position in the commodity which they produced or dealers in a commodity in which they dealt. *See, e.g., United States v. Bondurant,* 245 F.2d 265 (6th Cir.1957) (cotton shipper in cotton); *Hufford v. United States,* 254 F.Supp. 272 (E.D.Wash.1965) (barley jobber in barley seed); *Stefka v. United States,* 2 A.F.T. R.2d 5538 (W.D.Tex.1958) (cotton farmers in cotton). The determination of whether property is held or sold in the ordinary course of a trade or business is a question of fact. *Investors Diversified Services v. Commissioner of Internal Revenue,* 325 F.2d 341, 354 (8th Cir.1963).

One fact considered an earmark of a capital asset in cases such as this one is whether the taxpayer sufficiently segregated the investment property from the taxpayer's ordinary course of trade or business property. *See e.g., United States v. Bondurant, supra,* 245 F.2d at 268; *Carl Marks & Co. v. Commissioner of Internal Revenue,* 12 T.C. 1196, 1202 (1949). In this case, following redemption the rye was stored in twenty-three storage bins readily identifiable from plaintiffs' other bins of rye. The parties have stipulated that the rye remained in those same twenty-three bins until it was sold in a single transaction in July, 1976.

Added to this objective indicator of the taxpayers' intent, this court views as important the fact that when plaintiffs redeemed, the difference between the redemption price for the rye and the market price was slight. It has been stipulated that the redemption rate for rye, including interest, was 86.3 cents per bushel. At the time of redemption, the market price was only 88 cents per bushel. This difference is even slighter when the costs of hauling the rye to the marketplace are considered. Thus, it seems reasonable that taxpayers, who had never before redeemed a pledged crop, did not seek an immediate economic advantage by redeeming in this case. Moreover, there is no evidence suggesting that the taxpayers needed the grain for some other reason such as feed for livestock. Indeed, this seems rather implausible in light of the stipulated fact that plaintiffs had 110,000 bushels of rye never pledged to the CCC on hand when they redeemed.

Apparently, it was the taxpayers' personal opinion that rye was a "tag-along" to wheat in regard to price. At the time the taxpayers redeemed, wheat prices had begun to go up, and taxpayers believed rye prices would follow. Statements by one of the taxpayers or an agent of theirs to the effect that taxpayers intended to hold the rye for an indefinite period based on a belief that the market price would go up would ordinarily be afforded little evidentiary weight. Such statements, made after the IRS has assessed a deficiency, are vulnerable because they are self-serving. But in this case, these statements are buttressed by other, more objective evidence. Plaintiffs consulted their tax counsellors regarding the tax consequences of redeeming. Their attorney received a letter from a local IRS office indicating that the IRS would not follow the *Thompson* decision. This letter, dated prior to the redemption, is in evidence. Plaintiffs' accountant of thirty years, using as a basis for his advice the IRS letter and his own knowledge of the tax law, informed plaintiffs of the favorable capital gains tax treatment they would receive on a subsequent sale of the rye. All of this renders more believable evidence that the taxpayers thought they were effectively investing in the redeemed rye. *See generally Hufford v. United States, supra,* 254 F.Supp. at 273 (purpose for which asset was acquired, i.e., for sale or investment, is a factor in determining character of assets). It also indicates that the taxpayers proceeded in good faith. *See United States v. Bondurant, supra,* 245 F.2d at 268 ("Whether they are actually capital assets ... is a question of fact, depending upon all the facts in the case, including ... good faith.").

Finally, the "isolated nature" of the redemption in this case is an additional fact in favor of labeling the rye a capital asset. *See Hufford v. United States, supra,* 254 F.Supp. at 275. It is additional proof that the rye was not sold or held in the taxpayers' ordinary course of business.

## CONCLUSION

It is the opinion of this court that the taxpayers' redemption of rye in 1973 was for tax purposes a "repurchase" of the rye. This redemption did not by itself entitle taxpayers to capital gains treatment. Rather, redemption merely afforded the taxpayers the opportunity to take an investment position in a commodity they produced on their own farm. Having examined all the relevant facts, this court believes the taxpayers demonstrated a good

faith intention to treat the rye as an investment rather than property held primarily for sale in the ordinary course of their business. Consequently, they were entitled to capital gains treatment on the rye in 1976, and are now entitled to the claimed refund, with interest.

The foregoing memorandum opinion represents the findings and conclusions of this court.