Michael D. MAGNO, Plaintiff,

v.

Helen Louise Bowling CORROS, Administratrix of the Estate of Ricardo Abello Corros, Defendant and Third-Party Plaintiff,

v.

UNITED STATES of America and Exxon Corporation, Third-Party Defendants.

Civ. A. No. 75–732.

United States District Court,
D. South Carolina,
Charleston Division.

Oct. 20, 1977.

---

C. D. Hopkins, Jr., North Charleston, S.C., for plaintiff.

Wheeler M. Tillman, Charleston Heights, S.C., for defendant and third-party plaintiff.

Allen P. van Emmerik, Admiralty and Shipping Section, Dept. of Justice, Washington, D.C., for defendant, United States of America.

B. Allston Moore, Jr., Charleston, S.C., for defendant, Exxon Corp.

BLATT, District Judge.

Plaintiff, injured when the motorboat in which he was riding as a passenger collided with a dike constructed by the United States, here sues the estate of the boat owner, who was killed as a result of the same collision. The estate, as third-party plaintiff, impleaded both the United States and Exxon Corporation, seeking indemnity against the United States for any amount it must pay plaintiff, and, further, seeking damages against both third-party defendants resulting from the injuries to, and death of, the boat owner and for the loss of the boat and motor. Plaintiff amended his complaint to seek damages against both third-party defendants and later settled his claim against the Corros estate. The court granted an involuntary dismissal with prejudice to Exxon at the completion of the plaintiff's case, and the two-year limitation in the Suits in Admiralty Act, 46 U.S.C. § 745, served to bar plaintiff's claim against the United States. All actions were brought pursuant to the Suits in Admiralty Act, 46 U.S.C. § 742, *et seq.* A trial was held on February 8–February 10, 1977, involving all liability issues except the counterclaim by the United States against the Corros estate under the Medical Care Recovery Act (42 U.S.C. § 2651), for medical expenses incurred in treating Mr. Corros and his passengers. After receiving briefs from and hearing argument by counsel for the estate, the United States, and the Exxon Corporation, on September 27, 1977, the court makes the following findings of fact and reaches the following conclusions of law:

## FINDINGS OF FACT

### A. *The Casualty*

1. On the morning of September 29, 1973, Ricardo Abello Corros, Reynaldo A. Pellos and Michael D. Magno launched Mr. Corros' boat from the United States Naval Weapons Station on the Cooper River at Charleston, South Carolina, to go fishing. All three men were on active duty with the United States Navy, and all were on liberty.

2. Mr. Corros' boat was a 15-foot, open, fiberglass-hulled, outboard, with steering wheel and engine controls located about one-third of the way behind her bow. There was a passenger compartment forward of this steering location and its windshield, as well as one aft. The boat was powered with an 85 horsepower motor, the maximum which she was designed to carry—half speed was 29 m. p. h., full speed was 39 m. p. h.

3. The group proceeded down the Cooper River to fish at places not relevant here, and ended the day fishing in the Wando River. They returned from the Wando River toward the Cooper River and the Naval Weapons Station with Mr. Corros at the controls at all times. To make this homeward trip, they rounded the southern tip of Daniel Island, running from half to full speed outside the channel between Daniel Island on their starboard hand and buoys N–44 and R–46 on their port hand. There was a chart in the glove compartment of the boat, but no searchlight was being used. The evening was clear and it was almost completely dark when the collision occurred—there was no moon—the water was calm—the wind was moderate—the tide was flooding and was about one hour from high tide.

4. At approximately 8:00 o'clock p. m. on September 29, 1973, the boat ran into a sheet steel pile structure, known as the Daniel Island contraction dike, at a point on its length about 280 feet from its channelward end. All three men were thrown into the water, and all were injured. Mr. Corros died of his injuries some five days later; he was 34 years old, and left a widow and three children.

### B. *The Dike*

5. The Daniel Island contraction dike—(the dike)—was built pursuant to the River and Harbor Act of September 3, 1954, 68 Stat. 1248, which amended the River and

Harbor Act of October, 1940, 54 Stat. 1198. Its purpose was to increase the water velocity in the Cooper River channel near it and to reduce shoaling in that channel caused by silting resulting from certain upstream activities conducted by the State of South Carolina. The dike was completed in February, 1959; from the Daniel Island shoreline, it runs 1,100 feet to the southwest. The first 100 feet is a rubble mound anchoring the shoreward end of a 1000-foot sheet steel pile wall. The channelward end is anchored by a terminal cell, a sheet steel pile cylinder 23 feet in diameter, filled with crushed rock. The top of the terminal cell and the top of the pile wall are elevated about nine feet above mean low water. With the tide likely at the time of the collision, the top of both the cell and the wall were then about two feet above the water's surface, and not visible to an approaching boatman.

### C. *The Light*

6. Cooper River Dike Light 46–A, a fixed tower structure supporting an all-around white light, flashing every four seconds, with the light having a rated visibility of four miles, was built on the channelward portion of the terminal cell in April, 1959.

7. The purpose of Light 46–A is to mark the channel's eastern boundary and to mark the end of the dike. No other lights mark the dike.

8. The Light was functioning at all times pertinent to this tragedy.

### D. *The Exxon Pier*

9. Across the Cooper River from the dike and the light, there is a petroleum pier and mooring dolphin complex owned by Exxon, or its predecessors, since its construction in 1934. This pier extends about 350 feet into the Cooper River from the low water shoreline to the west face of the wharf. The total north-south length of this facility is 950 feet; it roughly parallels the channel in the Daniel Island Reach portion of the Cooper River.

10. The Exxon pier is lighted all night by a total of 81 lights on the piers proper, plus lights in two offices. All of these are 60 watt 360° white lights, except 7–60 watt red 360° lights at petroleum handling stations, 2–150 watt white 180° lights facing south, 2–150 watt reflector white lights directed down, 2–250 watt mercury vapor 360° lights, and, on a tower on the west face of the pier, 1–150 watt white 180° flood light facing southeast, 2–250 watt 360° mercury vapor lights on the east side, 1–300 watt white 180° flood light facing east, 2–150 watt mercury vapor 360° lights on the east side, 2–100 watt 360° white lights, and 3–500 watt 360° mercury vapor lights.

11. There are no other lights on this facility specifically designed to warn boats or ships, nor would the Coast Guard, if asked, require any such warning lights in view of the existing lights on this dock. The dock was constructed pursuant to the terms of a permit issued by the Department of the Army, Corps of Engineers, on January 31, 1955, and the facility was completed by the end of the year 1956. Exxon was required by the provisions of § 66.01–35 of Title 33, of the Code of Federal Regulations —(Navigation and Navigable Waters)—to display, at its own expense, such lights for the protection of navigation as might be prescribed by the Commandant of the Naval District. There was no evidence that Exxon had made such lighting application, although Commander William J. Brogdon, Jr., USCG, Chief of the Aids to Navigation Branch of the Seventh Coast Guard District, testified that since approximately twenty (20) years had passed from the time the pier was constructed, the absence of such a permit in the file was not unusual. He further testified that if such an application had been made in 1956, and if the lights in 1956 were essentially the same as they are now, he would be the person responsible for acting upon the application, and he would have approved the Exxon lighting scheme, since the structure itself is very well lighted, and the object of lighting an obstruction is to prevent the boating public from colliding with it. Exxon did

present proof that its lighting is substantially the same now as it was in 1956, and that its facility was inspected by the United States Coast Guard twice a year in accordance with 33 C.F.R. § 126.01, *et seq.*, in order to qualify as a "designated waterfront facility" to handle dangerous cargo. One of the prerequisites to such a designation is adequate lighting, 33 C.F.R. § 126.-15(1)(n). The "Waterfront Facility Inspection Reports" dated March 15, 1973, and November 23, 1973, respectively, indicated that the "illumination" of the Exxon dock was in conformance with Coast Guard regulations regarding that type of inspection. 33 C.F.R. § 126.01, *et seq.*

### E. *Liability*

12. U.S. Coast & Geodetic Survey Chart No. 470 and the Inland Rules of the Road apply to the scene of this casualty. Chart 470 is the most detailed chart of the area. All the foregoing features pertinent to this casualty are shown on Chart 470, among such being the Cooper and Wando Rivers, Daniel and Drum Islands, buoys N–44 and R–46, light 46–A, the dike, and the Exxon pier.

13. While Chart 470, or some other harbor chart, was available to Mr. Corros in his boat's glove compartment, on his return trip on September 29, 1973, to the Naval Weapons Station from the Wando River, there is no evidence that he used such chart or charts on that occasion.

14. Mr. Corros was well aware of the existence and location of the dike and of light 46–A. He had fished in that area for four or five years preceding the casualty, anchoring on occasion in the immediate vicinity of the dike to fish. After buying his boat in February, 1973, he fished often, navigating the Cooper River from the Naval Weapons Station, among other areas, usually returning after dark. On each of these occasions, he went around the light and the end of the dike, or this casualty would have occurred earlier; indeed, his fishing companion of several years, Mr. Johnson, testified that he and Mr. Corros often returned home after dark along the same route, namely, between buoys N–44 and R–46 on their port hand and Daniel Island on their starboard hand, but always going around light 46–A and the dike.

15. Mr. Corros did not have either of his passengers keep a lookout; however, Mr. Corros, from his position at the wheel, was looking ahead. Apparently, no one on the boat saw the dike until the boat was close to the point of impact. The boat hit the dike nearly head-on. Government counsel suggests that the speed of the boat caused the boat to plane, thus lifting its bow out of the water to obstruct or impair Mr. Corros' vision. The damage to the front of the boat—no damage underneath the curvature of the bow—suggests that the boat was flat in the water when the collision occurred, not planing. In addition, on November 21, 1976, Gary N. Thomas, a witness for the Corros estate, in a very close duplication of the accident, made four runs at the 280 foot impact point on the dike at a medium or moderate speed, in a 15 foot Caravelle fiberglass boat identical to the one owned by Corros, with an 85 horsepower outboard Evinrude motor. Mr. Thomas testified that once the boat reached cruising speed, it leveled off and ran flat so that the bow did not obstruct his vision. This court is convinced that an unobstructed lookout was maintained by Mr. Corros.

16. Light 46–A at all pertinent times complied with the lateral buoyage system of the United States, as to its color and characteristics. It correctly marked the channel and correctly marked the channel user's way around the dike, being designed to direct northbound traffic to leave the dike to starboard.

17. The lights on the Exxon pier are not in line with light 46–A for vessels using the channel of the Cooper River. For small craft operators proceeding like Mr. Corros, light 46–A is horizontally within the arc of the Exxon lights as such craft round the southern end of Daniel Island. However, on an approach from that vicinity, light 46–A is readily distinguishable from the Exxon lights behind it, both because as the dike is approached, the dike light shows

about twice as high above the water as the Exxon lights, and because the dike light is a flashing light. The vertical displacement of the dike light over the Exxon lights increases greatly as a boat approaches; accordingly, at no time when the dike presents a hazard to an approaching boater would an observant boater lose the dike light in the background of the Exxon lights.

18. Due to the angle of the dike from the shore of Daniel Island—(56° South of West)—it is possible for a mariner riding close to the Island, and out of the channel, to lose sight of the dike light on his port side, as he moves past the light, before reaching the dike itself.

## CONCLUSIONS OF LAW

### A. Jurisdiction

1. This court has jurisdiction of the parties and subject matter of this litigation. (28 U.S.C. § 1333, 28 U.S.C. § 1346(b)). Venue is correctly laid. (28 U.S.C. § 1391, 46 U.S.C. § 742).

### B. Nature of Claims

2. The Corros estate, in addition to seeking indemnity for anything which it has paid the plaintiff, asserts affirmative claims against the United States and Exxon Corporation for the personal injuries to, and wrongful death of, the decedent, together with a claim for property damage to the boat. The United States, on the other hand, counterclaims against the Corros estate under 42 U.S.C. § 2651 for medical expenses it incurred for treatment rendered to Mr. Corros and his two passengers.

### C. Negligence and Liability of Exxon

3. In this litigation, the Corros estate seeks recovery against Exxon Corporation, either jointly with the United States, or severally. The basis of the estate's claim against Exxon rests upon an alleged violation of 33 U.S.C. § 403, which reads in part as follows:

> "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the

waters of the United States is prohibited . . . . ."

4. Specifically, in support of its claim against Exxon, the Corros estate charges that Exxon failed to comply with the requisite permit requirements in 1955 when the lights on the Exxon dock were installed.

5. This court finds that Exxon did not comply with the statutory requirement, 33 C.F.R. § 66.01–35, that it have the Coast Guard approve proper lighting for its dock. Although the dock was inspected twice a year as a waterfront facility for loading dangerous cargo, and the Coast Guard made no general objection to the lighting scheme, the Waterfront Facility Inspection Reports do not satisfy the requirement that Exxon —(the permittee)—"shall apply" to the District Commandant of the Coast Guard for lighting approval. 33 C.F.R. § 66.01–35.

6. The Code of Federal Regulations has the same force and effect, as do Acts of Congress (*Rodway v. U. S. Dept. of Agriculture*, 168 U.S.App.D.C. 387, 514 F.2d 809 (1975)); accordingly, any violation of the Code of Federal Regulations can be said to be a "statutory" violation, as opposed to a violation of the general standards of due care. It is only "statutory" fault which invokes the so-called "Pennsylvania Rule" of admiralty law. In *The Pennsylvania*, 19 Wall. 125, 86 U.S. 125, 136, 22 L.Ed. 148 (1873), the Supreme Court stated this rule as follows:

> ". . . But when, as in this case, a ship at the time of a collision is in actual violation of a statutory rule intended to prevent collisions, it is no more than a reasonable presumption that the fault, if not the sole cause, was at least a contributory cause of the disaster. In such a case, the burden rests upon the ship of showing not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been."

In view of the "statutory" violation of Exxon—*i. e.*, permit violation—this court is required to apply the "Pennsylvania Rule" to Exxon to determine its liability to the Corros estate.

7. The only way that Exxon's aforesaid "statutory" fault could have contributed in any manner to the accident in question would be if Exxon's dock lights' presented background lighting which tended to obscure the dike light to one approaching as did the decedent here. However, the meshing of the dock lights with the dike light is a matter over which, as the record reveals, Exxon had no control. The positioning and illumination of the dock lights were within Exxon's authority, but Exxon had no authority whatsoever over either the construction of the dike light or the dike itself. Thus, Exxon cannot now be charged with the totality of the maritime conditions surrounding its dock.

8. This court has concluded that Exxon has overcome the burden imposed upon it under the "Pennsylvania Rule." With regard to the lighting factors just mentioned, Exxon has proved to the satisfaction of this court that its statutory violation of the duty to secure a permit could not possibly have contributed to the collision between the boat and the dike because, as heretofore found—(Finding of Fact # 17)—the Exxon lights were of no moment to an approaching boat when the dike became a hazard.

9. Since this court has concluded that Exxon has proven its limited involvement in the lighting combination pattern could not possibly have contributed to the injury and death of Mr. Corros, this court finds, and it is so ordered, that Exxon Corporation has no liability to the Corros estate.

## NEGLIGENCE AND LIABILITY OF THE UNITED STATES

10. The United States had clear authority to construct the dike in question. (33 U.S.C. § 403). It also is given discretion to decide, once having constructed the dike, whether or not to mark it. (14 U.S.C. § 86). The Corros estate's dispute with the United States, and one of the legal issues to be decided by this court, is whether the United States, having made the decision to place the Daniel Island contraction dike in the Cooper River, and having further decided to light the dike, abused its discretion under 14 U.S.C. §§ 2, 81, and 86, in marking the dike with only one light at its channel end.

11. The United States contends that the Corros estate cannot question the decision to place the dike in the Cooper River, nor the manner, fashion, style, or means of marking the dike, whether such marking be done by a light, or multiple lights, flags, condensing panels, additional floating buoys, relocation of existing buoys, or other means. This is the "discretionary function" exception which, under the Federal Tort Claims Act, 28 U.S.C. § 2680(a)—when such Act is applicable—relieves the United States from responsibility for acts done in the discretion of its agents. The United States, under this theory, urges this court to follow the First Circuit Court of Appeals which has held that the "discretionary function" exception, clearly stated in the Federal Tort Claims Act, applies as well to the Suits in Admiralty Act, under which this suit is brought, even though that exception is not stated therein. Such is the impact of *Gercey v. United States*, 540 F.2d 536 (1 Cir. 1976). That decision, however, runs contrary to the rule in this Circuit, because our Court of Appeals has precisely, and quite clearly, reached the opposite conclusion:

> "There is no basis upon which we can import the many exceptions in the Tort Claims Act into the Suits in Admiralty Act, where the United States is to be held accountable in admiralty whenever a private person, in similar circumstances, would be." *Lane v. United States*, 529 F.2d 175, 179 (4 Cir. 1975).

12. The United States also contends that it constructed and marked the dike according to its usual procedure and that it has no further responsibility. However, the Corros estate claims that the United States abused its discretion in failing to properly and sufficiently mark the dike to give warning to approaching boaters. The Coast Guard, despite its authority to establish aids to navigation and to mark obstructions—(14 U.S.C. §§ 2, 81, and 86)—has been held liable in many instances for improperly and negligently performing such duties. Citing

the "good Samaritan" rule, the United States Supreme Court has determined the extent of this responsibility, once a decision to establish and/or mark an aid to navigation has been made. In a Federal Tort Claims Act case involving the failure of a lighthouse light, that Court said:

". . . it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner." *Indian Towing Company v. United States*, 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48 (1955).

In discussing the duty of the United States in such circumstances, the Court in *Indian Towing* further said:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light . . . and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning." *Id.*, at page 69, 76 S.Ct. at page 126.

The Fourth Circuit Court of Appeals adopted this "good Samaritan" rationale, and warned in clear language against a government sponsored nautical "trap." In a case involving negligent marking of a wreck, that Court said:

". . . even if the decision to mark or remove the wreck be regarded as discretionary [a Tort Claims Act case], there is liability for negligence in marking after the discretion has been exercised and the decision to mark has been made. There is certainly no discretion to mark a wreck —(dike here)—in such way as to constitute a trap for the ignorant or unwary rather than a warning of danger." *Somerset Seafood Co. v. United States*, 193 F.2d 631, at 635 (1951). Explanations added).

In *Afran Transport Company v. United States*, 309 F.Supp. 650 (S.D.N.Y.1969), a case involving an off-station buoy, the district court, citing an early Supreme Court decision, held the Coast Guard to task regarding buoy placement, and "other warnings":

"As stated in *Casement v. Brown*, 148 U.S. 615, 627, 13 S.Ct. 672, 677, 37 L.Ed. 582 (1893): '(I)t would be placing too severe a condemnation on the conduct of the pilots in charge of the boats to say that their error of judgment, their dependence on the appearance of the stream, and *their reliance upon the duty of the defendants to place suitable buoys or other warnings*, was such contributory negligence as would relieve the defendants from liability for the results of their almost confessed, and certainly undoubted, negligence'." *Id.* at 658 (Emphasis added by Afran Court).

13. The United States argues in the instant case that it gave notice of the dike and dike light on the U.S. Coast and Geodetic Survey Chart and that this warning is sufficient to relieve it from all responsibility. However, as the case of *Lane v. United States*, 529 F.2d 175 (4 Cir. 1975) makes clear, the failure of an experienced navigator, familiar with the area, to consult a chart does not, in itself, absolve the United States of its liability.

14. The Corros estate's claim against the United States is founded upon what this court feels is an extremely dangerous dike obstruction, which obstruction spans about one-fourth the width of the Cooper River, is on some occasions almost totally submerged, is very dark, blackish-brown in color, has no markings of any kind, and upon the seaward end of which rests a single white, 4-second flashing light, that, when lit, only burns four-tenths of a second, with the power of 7 watts. The United States contends that it could not possibly, within the limits of its financial ability, place special lights and other such warnings upon all the various obstructions to navigation which exist in the waters of the United States because of the sheer number of such objects. This court, on the other hand, feels that very few of these objects existing

today could be as dangerous as the dike in question. Judicial review of the danger involved is dependent upon the special circumstances and facts surrounding the particular obstruction in question, not upon obstructions to navigation in general.

15. This court has concluded that the Daniel Island contraction dike must be in a class by itself. Considering evidence resulting from boating experiments conducted by three different witnesses, one presented by each party except the plaintiff, there was no testimony which suggested, under the circumstances facing Mr. Corros on the ill-fated night in question, that the outline of the dike itself could be seen—even against the background of the lights on the Exxon dock. The testimony concerning the boating experiments all centered around the visibility or invisibility of the small, flashing dike light. Based on this evidence, this court is persuaded that very little of the dike rose above the water level at the time of the collision, and that whatever part rose above the water level was hardly visible under the combined factors of the darkness, the competing light systems, and the blackish hue of the dike itself.

16. Seeking to escape all responsibility for the collision, counsel for the United States urges that the decedent's own negligence was the sole proximate cause of his injuries and resultant death because the decedent violated a number of nautical statutes. While this court does hold that the decedent was guilty of causal contributory negligence, judged by general negligence standards, based upon his familiarity with the dike area, this court does not feel that the decedent's negligence was the sole proximate cause of the fatal collision, nor that the decedent's violation of any statutory duties could possibly have been a proximate cause of the collision.

17. Reviewing the decedent's alleged statutory violations, this court has reached the following conclusions:

(a) *Speed.* There is no statutory nautical speed limit applicable in this case. Article 16 of the Inland Rules of Navigation, 33 U.S.C. § 192, directs a vessel to proceed at "a moderate speed," but this statute only applies to a vessel in "a fog, mist, falling snow, or heavy rainstorms." In a factually similar case, a motorboat—(17 foot, 115 H.P.)—struck a rowboat on a dark, moonless night, which rowboat was operating without lights and was standing only about two feet above the water, and the court found that the speed of the motorboat did not constitute negligence, nor was it a proximate cause of the collision. *Chimene v. Dow,* 104 F.Supp. 473 (S.D.Tex.1952). This court is persuaded by the evidence here that the decedent was operating his boat at a medium or moderate rate of speed and that such speed, under the circumstances then prevailing, was neither excessive nor negligent, and violated no applicable statute.

(b) *Outside the Channel.* There is no statutory nautical rule which required the decedent to operate his boat in the deep water channel between the red can buoys on the starboard side and the black can buoys on the port side thereof. In determining that a ship was not being operated negligently when it collided with a non-moving and anchored barge, outside the ship channel, the applicable rule has been quoted by the District Court for the Eastern District of Pennsylvania as follows:

"I know of no rule of law which limits the navigation of a vessel to a ship channel, as a land vehicle such as an automobile would be limited to operation on a highway. . . . The vessel may navigate at any part of a river containing navigable water." *American Dredging Co. v. Calmar S.S. Corp.,* 121 F.Supp. 255, 263 (E.D.Pa.1954), *affirmed,* 218 F.2d 823 (3 Cir. 1955).

Circuit Judge Donald Russell, sitting in 1969, as a district judge, followed this principle:

"The mere circumstance that the tug and barge were slightly west of the dredged channel is of no consequence. No rule of law required navigation in the dredged channel." *Marine Contracting and Towing Co. v. McMeekin Construction Co.,* 302 F.Supp. 804 (D.S.C.1969).

In the *McMeekin* case, Judge Russell further footnoted, with approval, from *Jones Towing, Inc. v. United States*, 277 F.Supp. 839, at 848 (D.La.1967):

"A vessel is entitled to the full reach of a navigable stream available to the line of high water, including muds along the shore." *Marine Contracting, Id.* at 809, fn. 3.

Operation of the Corros boat between Daniel Island on the starboard side and buoys N–44 and R–46 on the port side during a high stage of tide was not a proximate cause or concurring cause of this collision. The draft of this boat was very shallow, and there was ample depth for such a boat, even prior to reaching the "muds along the shore." Indeed, a cautious mariner would reasonably choose to stay clear of the ship channel in busy Charleston Harbor lest he be run down by one of the numerous Navy or commercial vessels traversing said harbor.

(c) *No Searchlight or Running Lights.* There is no nautical statutory requirement that the decedent use a spotlight or searchlight while operating his boat at night. The Motorboat Act of 1940, 46 U.S.C. § 526, *et seq.*, establishes the requirements for lights on boats like the decedent was operating. Statutorily, the decedent's boat was required to have (1) "a bright white light aft to show all around the horizon" and (2) "a combined lantern in the fore part of the vessel and lower than the white light aft, showing green to starboard and red to port . . . ." When the boat is "under way . . . no other lights which may be mistaken for those prescribed shall be exhibited . . . ." 46 U.S.C. § 526b. Such required lights existed on the decedent's boat, but there is no evidence that such lights were being used at the time of the collision. However, the failure to exhibit the running lights under the facts of this case could not possibly have contributed as a proximate cause of the collision because these lights would not have served in any manner to reveal the presence of the dike. *Cf.*, 46 U.S.C. § 526b(d).

While a searchlight or spotlight might seem prudent in retrospect, there is, nevertheless, no statutory requirement that such be used on a boat like Mr. Corros was operating, and the court does not feel that Mr. Corros was negligent in not having aboard and using such a light.

(d) *No Lookout.* Article 29 of the Inland Rules of Navigation, 33 U.S.C. § 221, provides: "Nothing in these rules shall exonerate any vessel . . . from the consequences . . . of any neglect to keep a proper lookout . . . ." However, a violation of the duty to keep a proper lookout is not recognized in the Fourth Circuit as a nautical statutory violation. Our Circuit's rule was enunciated in 1961 by Judge Soper:

"In our view the violation of the duty, although a serious one, is not a statutory fault with the extreme consequences imposed by the Pennsylvania rule. The purpose of Article 29, which refers to the negligence of a vessel to keep a proper lookout, was not to make an addition to the statutory rules of navigation theretofore set out, but to make certain that compliance with those rules would not excuse the failure of the ship to comply with the other well known rules of good seamanship which exist irrespective of statute." *Anthony v. International Paper Company*, 289 F.2d 574, at 581 (4 Cir. 1961).

In any event, the evidence persuades this court that Corros was keeping a proper lookout. One of the passengers, Pellos, testified that Corros was looking straight ahead while operating the boat:

Q. At the time the boat was heading back towards home, was Corros doing much talking at that time?

A. No. He was looking and driving. (Tr.33).

.   .   .   .   .

Q. On the trip back . . . did you observe him moving around in the boat?

A. He was right there behind the steering wheel. (Tr.33).

.   .   .   .   .

Q. . . . What was the position of his head while he was operating the boat?

A. He was looking forward.

Q. His eyes were looking forward?

A. Yes. (Tr.63).

(e) *Without a Chart.* There is no statutory mandate which requires operators of small boats to carry charts, *cf.*, 46 U.S.C. § 526k, and courts, especially, the Fourth Circuit Court of Appeals, have held the failure to use a chart not to be negligence *per se* under general standards.

In *Lane v. United States,* 509 F.2d 175, at page 180 (4 Cir. 1975), in discussing the exact contention raised by the government here, the Court said:

"Finally, the United States contends that Lane was contributorily negligent because he did not have with him and had not consulted the chart which had the wreck symbol on it. In some circumstances, particularly when large vessels are involved, the failure to have and to use current charts may be so obviously negligent as to require a finding to that effect. Circumstances are important, however, and consideration must be given to such things as the size of the vessel, its draft, the navigator's experience, his general familiarity with the waters, and his handling of the vessel. In a similar situation we held that experienced navigators of small boats, familiar with the waters, were not bound to notice information published in notices of the United States Lighthouse Service. *United States v. Travis,* 4 Cir., 165 F.2d 546, 548."

Since Mr. Corros was an experienced boatman, was thoroughly familiar with the waters involved, and had navigated these waters many times in the past, this court finds no statutory violation or negligence on the part of Mr. Corros, assuming *arguendo,* that he failed to consult the applicable river chart on his return trip.

18. While this court has concluded that the decedent did not commit any statutory violation that could have contributed as a proximate cause to the collision, so as to make the "Pennsylvania Rule" applicable to him, it further has concluded that the United States did not commit any statutory violations. The dike is an "obstruction" but one falling within the authority of the United States to create (33 U.S.C. § 403). Thus, the liability of the parties here must be determined by the general rules of negligence.

19. The United States is charged with a duty to exercise its discretion in deciding whether to mark an obstruction, and, having made the decision to mark the dike here, it was required to do so in a manner which would not constitute an abuse of that discretion. *Cf., Indian Towing v. United States,* 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955). This defendant contends, since it has produced testimony from its expert, Commander William Brogdon, Jr., to the effect that one light at the channel end of the contraction dike was sufficient, and since the Corros estate offered no rebuttal testimony, expert or otherwise, as to the type of lighting that would constitute reasonable warning of the obstruction, that the court must accept its expert testimony as conclusive on this issue. Such contention, in this court's opinion, is contrary to general evidentiary principles. Rule 702 of the Federal Rules of Evidence allows use of experts when their special knowledge or training will assist the court in understanding the evidence or in determining a fact in issue. However, it is well established that if men of ordinary knowledge are as capable of comprehending primary facts, and of drawing correct conclusions therefrom, as are "experts", such expert testimony may be properly disregarded. *Salem v. United States Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962). In like manner, it is the function of the finder of fact—(here, the court)—to weigh evidence, and even the testimony of expert witnesses may be disregarded if it conflicts with the sound judgment of the trial court based on its evaluation of all the evidence. *Barry v. United States,* 501 F.2d 578 (6 Cir. 1974). This is true even though an expert is not directly contradicted by a counter-ex-

pert or other direct testimony. *United States v. Coleman*, 501 F.2d 342 (10 Cir. 1974); *United States v. Collins*, 491 F.2d 1050 (5 Cir. 1974); *Hassan v. Stafford*, 472 F.2d 88 (3 Cir. 1973); *Mims v. United States*, 375 F.2d 135 (5 Cir. 1967).

■ In the present case, this court feels that the government expert's opinion of the sufficiency of the single light on the channel end of the 1000 foot dike, which dike at times is elevated only one to two feet above the water, is absolutely contrary to common logic and experience. Due to the color, shape, angle, appearance, and visibility of the dike in question, this court has concluded that marking it by a solitary light on its channelward end was grossly negligent and constituted a clear abuse of discretion. The court recognizes that there may be a "grey area" in which the question of "just how many dike lights would be sufficient" should be referred to those with special expertise in the field; however, the only question here is the reasonableness of a single light, and such light is clearly, in the view of this court, insufficient to warn a mariner of the existence and location of the dike. Such conclusion is reinforced by the statement of Chief Judge Haynsworth, writing for the panel, in *Thomson v. United States*, 266 F.2d 852, 855 (4 Cir. 1959):

> "Obviously, a wreck between the channel and the shore may be effectively marked by a single red or black marker, *but obstructions in otherwise vast expanses of navigable waters, bifurcations and junctions of channels are not so easily identified.*" (emphasis added)

Recognizing that Corros knew of the existence of the dike, this court believes that additional lighting would have alerted him to its exact location in the water and avoided the tragedy that occurred.

20. The court finds that the United States negligently abused its discretion in failing to properly light the dike and that such conduct was a proximate cause of the collision and the resulting injuries to, and death of, the decedent. The United States constructs thousands of legally permissible "obstructions" in the waterways of this country, and the court takes judicial notice that the construction, marking and maintaining of water diversion dikes requires special skills. Therefore, those to whom the United States entrusts this responsibility must have special insight into the natural consequences of the failure to use due care in marking such obstructions. The Daniel Island contraction dike, by reason of its location jutting out from the island, 56° South of West, on the east side of the Cooper River, was constructed across an expanse of water used by small boaters approaching from the Wando River, around the southern tip of Daniel Island, and heading up the Cooper River. The court has concluded that the United States should have foreseen that small boaters would be unable to see this particular dike after dark by reason of the special circumstances attendant to and surrounding its physical appearance; therefore, the United States should have taken extra care to adequately mark and/or light it. A single, white, 7 watt, flashing light on the channel end of this dike was not sufficient, in this court's opinion, to satisfy the government's duty to use due care, and the failure to install additional lighting, constituted negligence and a clear abuse of discretion.

### NEGLIGENCE ON THE PART OF MR. CORROS

■ 21. The decedent is not without fault in bringing about his own injuries and death. While this court has previously determined that he did not breach any statutory duty that could have possibly contributed as a proximate cause to the collision, such does not end the inquiry. Mr. Corros had fished in the Charleston area with his friend, William C. Johnson, Jr., over a four to five year period. Although there is no evidence that he owned a boat prior to February of the year he died, he was, nevertheless, a frequent passenger with Mr. Johnson in other small boats. There was evidence that he and Mr. Johnson had on occasion fished very near the Daniel Island contraction dike. The decedent was, therefore, very well aware of the existence of

the dike and because of his familiarity with the area, this court concludes, under the comparative negligence theory applicable in admiralty jurisprudence, *United States v. Reliable Transfer*, 421 U.S. 397, 409, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), that the decedent's negligence contributed as a proximate cause to his fatal injuries to the extent of seventy-five per cent (75%); thus, the sum which will hereafter be determined by this court to be reasonable compensation to be paid to the third-party plaintiff arising from the death of the decedent, Mr. Corros, must be diminished by that percentage.

Consistent with the conclusions reached herein, it is

ORDERED, that the third-party plaintiff have judgment against the third-party defendant, United States, in an amount to be hereafter determined by this court.

IT IS FURTHER ORDERED, that the recovery hereinabove directed in favor of the third-party plaintiff be reduced by seventy-five per cent (75%) due to the contributory negligence of the third-party plaintiff's decedent.

IT IS FURTHER ORDERED, that the third-party defendant, Exxon Corporation, have judgment in its favor.

AND IT IS SO ORDERED.